TREG TAYLOR
ATTORNEY GENERAL
Ronald W. Opsahl (Alaska Bar No. 2108081)
Assistant Attorney General
Department of Law
1031 West Fourth Avenue, Suite 200
Anchorage, Alaska 99501
Phone: (907) 269-5232
Facsimile: (907) 276-3697
Email: ron.opsahl@alaska.gov

FENNEMORE CRAIG P.C.
Norman D. James (AZ Bar No. 006901)
Tyler D. Carlton (AZ Bar No. 035275)
2394 East Camelback Road, Suite 600
Phoenix, Arizona 85016
Phone: (602) 916-5000
Facsimile: (602) 916-5546
Email:  njames@fennemorelaw.com
        tcarlton@fennemorelaw.com
(*admitted pro hac vice*)

Attorneys for Plaintiffs

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| STATE OF ALASKA,<br><br>        Plaintiff,<br><br>  v.<br><br>NATIONAL MARINE FISHERIES SERVICE,<br><br>        Defendant,<br><br>  and<br><br>CENTER FOR BIOLOGICAL DIVERSITY,<br><br>        Intervenor-Defendant. | Case No. 3:23-cv-00032-SLG<br><br><br>**PLAINTIFF'S OPENING BRIEF**<br><br><br>**(Oral Argument Requested)** |

30189431.4

# TABLE OF CONTENTS

I. INTRODUCTION ................................................................................................ 1

II. BACKGROUND ............................................................................................... 3

    A. The Requirements for Designating Critical Habitat ................................. 3

        1. Critical Habitat's Definition and Its Limited Scope ...................... 3

        2. The Legislative History Reinforces that Critical Habitat
           Is Limited to Specific Areas Truly Essential to the
           Species' Conservation ................................................................... 5

    B. Factual Background ................................................................................. 6

        1. Ringed Seal Background and 2012 Listing
           Determination ................................................................................ 6

        2. Bearded Seal Background and 2012 Listing
           Determination ................................................................................ 8

        3. The 2022 Critical Habitat Designations ...................................... 10

III. STANDARD OF REVIEW ............................................................................. 14

IV. ARGUMENT ................................................................................................. 15

    A. The Critical Habitat Designations Conflict with the Plain Meaning
       of the Relevant Statutory Language and Regulatory Provisions ........... 16

    B. NMFS Failed to Address Why the Critical Habitat Is
       Indispensable to the Seals' Survival When Substantial Portions of
       Their Ranges Are Outside of the Designations ...................................... 20

    C. NMFS Improperly Relied on Speculation Regarding the Presence
       of Essential Habitat Features ................................................................. 22

    D. NMFS Failed to Identify Any Physical or Biological Features that
       May Require Special Management Considerations or Protection ......... 27

    E. NMFS Failed to Analyze Whether Designation Is Prudent ................... 30

F.    NMFS Failed to Properly Consider the Economic Impacts of the
      Critical Habitat Designations and Determine Whether to Exclude
      Particular Areas..........................................................................................35

V.    CONCLUSION ..................................................................................................42

Case 3:23-cv-00032-SLG   Document 27   Filed 09/29/23   Page 3 of 56

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alaska Oil & Gas Ass'n v. Jewell,*
    815 F.3d 544 (9th Cir. 2016) ...................................................................... 26, 27

*Ariz. Cattle Growers' Ass'n v. U.S. Fish & Wildlife,*
    273 F.3d 1229 (9th Cir. 2001) ......................................................................... 20

*Ass'n des Éleveurs de Canards et d'Oies du Quebec v. Becerra,*
    870 F.3d 1140 (9th Cir. 2017) ......................................................................... 26

*Bennett v. Spear,*
    520 U.S. 154 (1997) ........................................................................................ 26

*Cape Hatteras Access Pres. All. v. U.S. Dept. of Interior,*
    344 F. Supp. 2d 108 (D.D.C. 2004) .................................................. 24, 25, 28, 29

*Ctr. for Bio. Diversity v. U.S. Fish & Wildlife Serv. ("CBD"),*
    67 F.4th 1027 (9th Cir. 2023) ...................................................................*passim*

*Home Builders Ass'n of N. Cal. v. U.S. Fish & Wildlife Serv.,*
    268 F. Supp. 2d 1197 (E.D. Cal. 2003) ............................................... 23, 24, 28

*Middle Rio Grande Conservancy Dist. v. Babbitt,*
    206 F. Supp. 2d 1156 (D.N.M. 2000) ........................................................*passim*

*Murphy Co. v. Biden,*
    65 F.4th 1122 (9th Cir. 2023) .......................................................................... 31

*N.M. Farm & Livestock Bureau v. U.S. Dep't of Interior,*
    952 F.3d 1216 (10th Cir. 2020) ....................................................................... 26

*Nat'l Res. Def, Council v. Jewell,*
    749 F.3d 776 (9th Cir. 2014) (en banc) ........................................................... 37

*Otay Mesa Prop., L.P. v. U.S. Dep't of the Interior,*
    344 F. Supp. 3d 355 (D.D.C. 2018) ................................................................. 20

*Weyerhaeuser v. U.S. Fish & Wildlife Serv.,*
    139 S. Ct. 361 (2018) ................................................................................*passim*

Case 3:23-cv-00032-SLG   Document 27   Filed 09/29/23   Page 4 of 56

**Statutes**

5 U.S.C. § 706 ................................................................................................ 14

16 U.S.C. § 1532 ....................................................................................... *passim*

16 U.S.C. § 1533 ....................................................................................... *passim*

16 U.S.C. § 1536 ............................................................................... 4, 5, 36

**Other Authorities**

50 C.F.R. § 402.14 ........................................................................................ 36

50 C.F.R. § 424.02 ........................................................................................ 27

50 C.F.R. § 424.12 .................................................................................. *passim*

H.R. Rep. No. 95-1625 (1978) ............................................... 5, 17, 35, 36

H.R. Rep. No. 96-167 (1979) ....................................................................... 36

S. Rep. No. 97-418 (1982) ........................................................................... 19

Proposed Threatened and Not Warranted Status for Subspecies and Distinct
   Population Segments of the Bearded Seal, 75 Fed. Reg. 77,496 (Dec.
   10, 2010) ................................................................................................... 9

Threatened Status for the Arctic, Okhotsk, and Baltic Subspecies of the
   Ringed Seal, 77 Fed. Reg. 76,706 (Dec. 28, 2012) ................................... 7

Threatened Status for the Beringia and Okhotsk DPS of the Bearded Seal,
   77 Fed. Reg. 76,740 (Dec. 28, 2012) .................................................. 9, 10

Regulations for Listing Species and Designating Critical Habitat, 84 Fed.
   Reg. 45,020 (Aug. 27, 2019) .............................................................. 22, 30

Designation of Critical Habitat for the Beringia Distinct Population
   Segment of the Bearded Seal, 87 Fed. Reg. 19,180 (Apr. 1, 2022) ..................... *passim*

Designation of Critical Habitat for the Arctic Ringed Seal, 87 Fed. Reg.
   19,232 (Apr. 1, 2022) ...................................................................... *passim*

## I. INTRODUCTION

On April 1, 2022, defendant National Marine Fisheries Service ("NMFS")[1] issued final rules designating critical habitat for the Beringia distinct population segment of bearded seal ("bearded seal") and the Arctic subspecies of ringed seal ("ringed seal").[2] Each of these unprecedented designations include an enormous area that exceeds _160 million acres_ and approximates the size of Texas. Each designation includes virtually all of the geographic area occupied by each seal within the jurisdiction of the United States, based on the extent of sea ice habitat features.[3]

In designating these massive areas as critical habitat, NMFS violated the Endangered Species Act ("ESA") and its implementing regulations in several significant respects. Most obviously, the designations conflict with the ESA's plain language, which defines critical habitat as "_specific areas_ within" a species' habitat that are "_essential to the conservation of the species_."[4] Further, NMFS failed to identify the specific areas on which the physical or biological features essential to the conservation of the species were found

---

[1] NMFS is responsible for administering the Endangered Species Act ("ESA") along with the U.S. Fish and Wildlife Service ("FWS"). The agencies are jointly called the "Services" when appropriate.

[2] Designation of Critical Habitat for the Beringia Distinct Population Segment of the Bearded Seal, 87 Fed. Reg. 19,180 (Apr. 1, 2022) ("Bearded Seal Designation"), AR-NMF4209; Designation of Critical Habitat for the Arctic Ringed Seal, 87 Fed. Reg. 19,232 (Apr. 1, 2022) ("Ringed Seal Designation"), AR-NMFS4260.

[3] _See_ Bearded Seal Designation, AR-NMFS4216-18, AR-NMFS4220; Ringed Seal Designation, AR-NMFS4267-69, AR-NMFS4272. Critical habitat may not be designated in areas outside U.S. jurisdiction. 50 C.F.R. § 424.12(g).

[4] 16 U.S.C. § 1532(5)(A)(i).

1

at the time of listing because it was "impracticable" to do so given the "dynamic" nature of sea ice.[5]

NMFS also failed to explain how each of the essential features may require special management protection, as the critical habitat definition and the agency's regulations require.[6] And NMFS did not make a specific finding on whether the designation of critical habitat would be prudent, as required by the plain language of the ESA and NMFS's regulations.[7] As explained below, there are valid grounds for a "not prudent" finding given the unique circumstances in this case, including the critical habitat's admitted lack of conservation benefit to the species.

Finally, NMFS failed to meaningfully consider the economic impacts likely to result from the critical habitat designations, as required by ESA Section 4(b)(2),[8] and instead assumed that that no project modifications or other requirements would ever be imposed to protect critical habitat areas. Additionally, the agency failed to meaningfully consider whether to exclude areas along Alaska's North Slope from critical habitat, despite requests for exclusion by the State of Alaska and North Slope Borough.

---

[5] Ringed Seal Designation, AR-NMFS4267; Bearded Seal Designation, AR-NMFS4215.

[6] *See* 16 U.S.C. § 1532(5)(A)(i); 50 C.F.R. § 424.12(b)(1)(iv).

[7] *See* 16 U.S.C. § 1533(a)(3)(A); 50 C.F.R. § 424.12(a).

[8] 16 U.S.C. § 1533(b)(2).

2

Accordingly, the State requests that the Court declare that NMFS violated the ESA and the Administrative Procedure Act ("APA")[9] in designating critical habitat for the bearded seal and the ringed seal and order that the designations be vacated.

## II.      BACKGROUND

### A.      The Requirements for Designating Critical Habitat

#### 1.      Critical Habitat's Definition and Its Limited Scope

When NMFS lists a species as an endangered or threatened species under the ESA, the agency must also "designate any habitat of such species which is then considered to be critical habitat" unless it is not prudent to designate critical habitat or critical habitat is not then determinable.[10]  The ESA defines "critical habitat," in relevant part, as "the _specific areas_ within the geographical area occupied by the species, at the time it is listed . . . on which _are found_ those physical or biological features (I) _essential_ to the conservation of the species and (II) which may require special management considerations or protection."[11] The definition also provides that "critical habitat shall not include the entire geographic area which can be occupied by the . . . species."[12]

The term "essential" is not defined in either the statute or the regulations.  The Ninth Circuit recently held that "essential" has its ordinary meaning of something that is indispensable or necessary to conserve the species, and not simply beneficial or capable of

_____

[9] 5 U.S.C. § 706.

[10] 16 U.S.C. § 1533(a)(3)(A)(i); _Weyerhaeuser v. U.S. Fish & Wildlife Serv._, 139 S. Ct. 361, 365, 368 (2018).

[11] 16 U.S.C. § 1532(5)(A)(i).

[12] _Id._ § 1532(5)(C).

promoting conservation.[13]   Similarly, the Supreme Court described critical habitat as "certain areas that are indispensable to the conservation of the endangered species."[14] Thus, within the geographic area occupied by the species, specific habitat areas must contain physical or biological features that are indispensable to the species' conservation and, furthermore, may require special protection or management to constitute critical habitat.  The ESA also provides that critical habitat is designated for a species only to the "maximum extent prudent."[15]

In designating critical habitat, NMFS must consider "the economic impact, the impact on national security, and any other relevant impact, of specifying any particular area as critical habitat."[16]  This provision allows areas to be excluded from critical habitat based on their relative costs and benefits, unless exclusion will result in the species' extinction.[17]

Once critical habitat is designated, Section 7 of the ESA restricts the authority of federal agencies to undertake, or to authorize non-federal entities to undertake, activities that may destroy or adversely modify critical habitat.[18]  Moreover, the federal agency and any non-federal permit applicant must "consult" with NMFS on activities that impact

---

[13] *Ctr. for Bio. Diversity v. U.S. Fish & Wildlife Serv. ("CBD")*, 67 F.4th 1027, 1036-38 (9th Cir. 2023).

[14] *Weyerhaeuser*, 139 S. Ct. at 369.

[15] 16 U.S.C. § 1533(a)(3)(A).

[16] *Id.* § 1533(b)(2).

[17] *Id.*; *see also Weyerhaeuser*, 139 S. Ct. at 365.

[18] 16 U.S.C. § 1536(a)(2); *see also Weyerhaeuser*, 139 S. Ct. at 366.

4

critical habitat to ensure that the Section 7 adverse modification standard is not violated.[19]

Consultation is often time-consuming and expensive, and frequently results in project modifications or other requirements to reduce impacts.

### 2. The Legislative History Reinforces that Critical Habitat Is Limited to Specific Areas Truly Essential to the Species' Conservation

The definition of critical habitat and the process for its designation were enacted in the ESA Amendments of 1978.[20] At that time, Congress was disturbed by the breadth of the Services' regulatory definition of critical habitat and how that definition was being applied by the agencies. The Senate Committee on Environment and Public Works, for example, criticized the agencies' expansive definition of critical habitat, explaining:

> It has come to [our] attention that under the present regulations, the Fish and Wildlife Service is now using the same criteria for designating and protecting areas to extend the range of an endangered species as are being used in designation and protection of those areas which are truly critical to the continued existence of a species. . . . There seems to be little or no reason to give exactly the same status to lands needed for population expansion as is given to those lands which are critical to a species continued survival.[21]

The Senate Report cited the critical habitat then proposed for the grizzly bear as an example of this regulatory overreaching, stating:

> [A]s much as 10 million acres of Forest Service land is involved in the critical habitat being proposed for the grizzly bear in three Western States. Much of the land involved in this proposed designation is not habitat that is necessary

---

[19] 16 U.S.C. § 1536(a)(2).

[20] Pub. L. No. 95-632, § 2(2), 92 Stat. 3571, 3571 (1978); *see also* Norman D. James & Thomas J. Ward, *Critical Habitat's Limited Role Under the Endangered Species Act and Its Improper Transformation into "Recovery" Habitat*, 34 UCLA J. Env't L. & Pol'y 1, 14-26 (2016) (discussing 1978 ESA Amendments' legislative history).

[21] S. Rep. No. 95-874, at 9-10 (1978). Excerpts attached as **Appendix A**.

for the continued survival of the bear. It instead is being designated so that the present population within the true critical habitat can expand.[22]

The congressional record therefore makes clear that critical habitat should be limited to specific areas that are essential to the species' continued existence, i.e., "*critical* habitat."

### B. Factual Background

#### 1. Ringed Seal Background and 2012 Listing Determination

The Arctic ringed seal is one of the most common mammals in the Arctic Basin. They are found throughout seasonally and year-round ice-covered waters of the Arctic Ocean Basin and southward into adjacent seas, including the Beaufort, Chukchi, and Bering Seas off Alaska's northern and western coast.[23] "Arctic ringed seals are considered to occupy their entire historical range that falls within U.S. jurisdiction."[24] The figure below depicts the current range of all five ringed seal subspecies; the Arctic ringed seal's range is depicted in orange. [25]

---

[22] *Id.* at 10.

[23] Scientists recently estimated that the minimum population of ringed seals in the U.S. portion of the Bering, Chukchi and Beaufort Seas is 470,000 seals. Mark A. Nelson et al., *Subsistence Harvest of Ringed, Bearded, Spotted, and Ribbon Seals in Alaska Is Sustainable*, 40 Endangered Species Rsch. 1, 5 (2019), AR-REF20682, AR-REF20686.

[24] Ringed Seal Designation, AR-NMFS4272.

[25] U.S. Dep't of Com., *Status Review of the Ringed Seal (*Phoca hispida*)* (2010) ("Ringed Seal Status Review"), AR-REF2015, AR-REF2037.

6



As shown above, the total Arctic ringed seal population is widespread across various habitat types and political boundaries in the Arctic basin and is estimated to be in the millions.[26]   Subsequent references to the ringed seal refer to the Arctic ringed seal subspecies unless otherwise indicated.

Despite its extremely large population and extensive range, NMFS listed the ringed seal as a threatened species in 2012.[27]   NMFS determined that the ringed seal is likely to become an endangered species in the foreseeable future based on reductions in the extent

---

[26] *See id.*, AR-REF2037, AR-REF2055-58; Threatened Status for the Arctic, Okhotsk, and Baltic Subspecies of the Ringed Seal, 77 Fed. Reg. 76,706 (Dec. 28, 2012) ("Ringed Seal Listing"), AR-NMFS0044, AR-NMFS0055.

[27] Ringed Seal Listing, AR-NMFS0045.

and timing of sea ice and on-ice snow cover projected to occur by 2100, and therefore listed the species as threatened.[28]  NMFS did not propose critical habitat, however, finding it was not then determinable.[29]

### 2. Bearded Seal Background and 2012 Listing Determination

Bearded seals are common marine mammals with a circumpolar distribution south of 85 degrees North latitude.  The figure below depicts the current range of the two bearded seal subspecies; the Pacific bearded seal subspecies, *Erignathus barbatus nauticus*, which is found in Alaskan waters, is depicted in orange.[30]



---

[28] *Id.*, AR-NMFS0045, AR-NMFS0049-50, AR-NMFS0055.

[29] *Id.*, AR-NMFS0058.

[30] U.S. Dep't of Com., *Status Review of the Bearded Seal (*Erignathus barbatus*)* 14 (2010) ("Bearded Seal Status Review"), AR-REF1752, AR-REF1781.

In listing the bearded seal, NMFS further divided the Pacific bearded seal subspecies into two distinct population segments ("DPS"), the Beringia DPS and the Okhotsk DPS.[31] The Okhotsk DPS is limited to the Sea of Okhotsk and is not relevant to this case.[32] The Beringia DPS occupies the Arctic Ocean and adjacent seas along the northern coasts of Russia, the United States, and Canada, including the Beaufort, Chukchi, and Bering Seas, where the species is a common marine mammal.[33] Subsequent references to the bearded seal refer to the Beringia DPS of bearded seal unless otherwise indicated.

"[B]earded seals of the Beringia DPS are considered to occupy their entire historical range that falls within U.S. jurisdiction."[34] The minimum population of bearded seals in the U.S. portion of the Bering and Chukchi Seas was recently estimated to be 357,329 seals, which does not include the Beaufort Sea where bearded seals also occur and breed.[35]

Despite the bearded seal's large population and extensive range, NMFS listed the bearded seal as a threatened species in 2012.[36] The primary basis for listing the bearded seal was projected reductions in the extent and timing of sea ice habitat resulting from

---

[31] Proposed Threatened and Not Warranted Status for Subspecies and Distinct Population Segments of the Bearded Seal, 75 Fed. Reg. 77,496, 77,499-500 (Dec. 10, 2010), AR-NMFS0022, AR-NMFS0025-28.

[32] *See id.*

[33] *Id.*, AR-NMFS0025-28.

[34] Bearded Seal Designation, AR-NMFS4220.

[35] Mark A. Nelson et al., *supra*, AR-REF20686.

[36] *See* Threatened Status for the Beringia and Okhotsk DPS of the Bearded Seal, 77 Fed. Reg. 76,740 (Dec. 28, 2012), AR-NMFS0079 ("Bearded Seal Listing").

9

climate change, which NMFS expects to threaten the species with extinction by 2100.[37] However, NMFS declined to designate critical habitat for the bearded seal at that time, finding it was not then determinable.[38]

### 3. The 2022 Critical Habitat Designations

NMFS proposed rules designating critical habitat for the two seals in 2021.[39] The State of Alaska submitted comments opposing the proposed designations, which discussed the adverse economic impacts that the critical designation would likely have on Alaskans and Alaska industries as well as serious problems with proposed designations, including the massive geographic areas being proposed, the failure of the agency to show that the essential habitat features are actually found throughout these areas, and the lack of any credible benefit to the species.[40] The North Slope Borough also submitted detailed comments opposing the proposed designations, which discussed the adverse impacts to the Borough and its citizens and identified numerous problems with the designations.[41] The State and Borough both requested, if critical habitat were designated, that buffer areas around Alaskan communities and along the Chukchi and Beaufort seacoasts and adjoining

---

[37] Bearded Seal Listing, AR-NMFS0079, AR-NMFS0081-83, AR-NMFS0087.

[38] *Id.*, AR-NMFS0089.

[39] Ringed Seal Designation, AR-NMFS4260; Bearded Seal Designation, AR-NMFS4209.

[40] State of Alaska Comments, AR-PUB14283-305 (addressing both seals).

[41] North Slope Borough Comments, AR-PUB14223-41 (ringed seal), AR-PUB14523-41 (bearded seal).

waters be excluded from critical habitat to avoid conflicts with commercial and industrial activities, in accordance with ESA Section 4(b)(2).[42]

The final critical habitat designations were published on April 1, 2022. Each designation consisted of a "single area" in Alaskan waters that together encompass virtually all of the Bering, Chukchi, and Beaufort Seas from the Alaska shoreline to the limit of the U.S. Exclusive Economic Zone ("EEZ"). The area included in each designation was enormous: the ringed seal's critical habitat contained about _164 million acres_ while the bearded seal's critical habitat contained about _175 million acres_, with a combined area (including overlap) of about _207 million acres_. By contrast, Texas contains about 172 million acres.[43] Maps from the final rules are reproduced below.[44]

---

[42] State of Alaska Comments, AR-PUB14301; North Slope Borough Comments, AR-PUB14239-40, AR-PUB14539-41.

[43] State of Alaska Comments, AR-PUB14291.

[44] Ringed Seal Designation, AR-NMFS4315; Bearded Seal Designation, AR-NMFS4259.





Despite their enormous size, NMFS indicated that the entire area is occupied by the two species and that no unoccupied areas were being designated.[45]

NMFS identified sea ice and prey resources as the physical and biological features essential to the seals' conservation. Specifically, in designating the ringed seal's critical habitat area, NMFS identified three essential features: (1) snow-covered sea ice suitable for birth lairs and sheltering pups; (2) sea ice suitable as a platform for basking and molting; and (3) the presence of the seal's primary prey species.[46] The essential habitat features identified for the bearded seal were very similar, with the exception that bearded seals use areas with shallower water, typically less than 200 meters deep.[47] In both designations, NMFS acknowledged that the specific locations of the seals' sea ice habitat features "vary from year to year, or even day to day," and that the areas designated as critical habitat only contain sea ice essential features "at certain times."[48] Both seals' primary prey species occur throughout the entire geographic area, with no single area being more important to the species.[49] Consequently, NMFS did not designate specific areas that contained essential habitat features.

NMFS asserted that the seals' essential habitat features may require special management due to threats from climate change; oil and gas exploration, development, and

---

[45] Ringed Seal Designation, AR-NMFS4272; Bearded Seal Designation, AR-NMFS4220.

[46] Ringed Seal Designation, AR-NMFS4264-67.

[47] Bearded Seal Designation, AR-NMFS4210, AR-NMFS4213-15.

[48] *Id.*, AR-NMFS4215; Ringed Seal Designation, AR-NMFS4267.

[49] Ringed Seal Designation, AR-NMFS4269; Bearded Seal Designation, AR-NMFS4217-18.

production; marine shipping and transportation; and commercial fisheries, but did not explain the management requirements of the essential habitat features or how they would be implemented following designation.[50] NMFS instead stated that the critical habitat designations would not result in any project modifications or other restrictions on activities beyond what would occur in the absence of the designations.[51] As a result, NMFS did not "further consider and weigh the benefits of excluding any particular area based on economic impacts against the benefits of designation."[52] No areas were excluded from the species' critical habitat under Section 4(b)(2) except for an area in the Beaufort Sea excluded from the ringed seal's critical habitat on national security grounds.[53]

## III.    STANDARD OF REVIEW

A critical habitat designation is subject to judicial review under the Administrative Procedure Act, 5 U.S.C. § 706(2).[54] Vacatur is necessary if the designation is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."[55] "Agency action is arbitrary and capricious when the agency 'relie[s] on factors which Congress has not intended it to consider, entirely fail[s] to consider an important aspect of the problem,

---

[50] Ringed Seal Designation, AR-NMFS4269-72; Bearded Seal Designation, AR-NMFS4218-20; *see also* 16 U.S.C. § 1532(5)(A)(i) (definition of occupied critical habitat).

[51] Ringed Seal Designation, AR-NMFS4274; Bearded Seal Designation, AR-NMFS4222.

[52] Ringed Seal Designation, AR-NMFS4274; Bearded Seal Designation, AR-NMFS4223.

[53] Ringed Seal Designation, AR-NMFS4276-78.

[54] *CBD*, 67 F.4th at 1034-35.

[55] *Id.* at 1035 (quoting 5 U.S.C. § 706(2)(A)).

[or] offer[s] an explanation for its decision that runs counter to the evidence before the agency.'"[56]

## IV. ARGUMENT

As explained below, NMFS's unprecedented critical habitat designations violate the ESA's statutory and regulatory provisions governing critical habitat in several respects. The ESA defines critical habitat, in relevant part, as "the specific areas within the geographical area occupied by the species . . . on which are found those physical or biological features . . . (I) essential to the conservation of the species and (II) which may require special management considerations or protection."[57]

NMFS's Texas-sized critical habitat designations plainly conflict with the definition of critical habitat, which is limited to "specific areas" that are "essential" to the species' conservation. At the same time, because both species are common, extensive habitat supporting large seal populations exists outside the designation, demonstrating that critical habitat is not truly essential. NMFS further conceded it could not identify the specific areas where the essential features of sea ice and prey resources occur within the designated areas. Nor did it explain how special management will conserve these essential features. Finally, NMFS did not analyze whether critical habitat designation is prudent under these circumstances while concurrently failing to conduct the exclusionary analysis required under Section 4(b)(2) and considering the economic costs of designation and the benefits

---

[56] *Id.* (alterations in original) (citation omitted).

[57] 16 U.S.C. § 1532(5)(A)(i).

of exclusion. Ultimately, NMFS's designation is full of errors and internal contradictions that require vacatur.

> **A.** **The Critical Habitat Designations Conflict with the Plain Meaning of the Relevant Statutory Language and Regulatory Provisions**

Because the primary habitat requirement of both seals is sea ice, NMFS determined that all areas within the jurisdiction of U.S. containing sea ice features on a consistent basis constitute critical habitat, resulting in the designation of all, or virtually all, of the species' suitable habitat in Alaskan waters as critical habitat.[58] For the ringed seal, the critical habitat designation encompasses over 257,000 square miles or 164 million acres, while the bearded seals' critical habitat designation encompasses 273,000 square miles or over 174 million acres.[59] NMFS's determination that this massive area is critical habitat is wholly inconsistent with the plain language of the relevant statutory and regulatory text.

These enormous designations deprive the statutory term "essential" of meaning. Critical habitat must be "essential," which means "'indispensable,' 'necessary,' and 'something more than convenient or helpful.'"[60] As the Ninth Circuit explained, "[t]aken together, both the accepted plain meaning of 'essential' and the relevant surrounding statutory terms in the ESA unambiguously establish that for an area to be 'essential' for

---

[58] Ringed Seal Designation, AR-NMFS4261, AR-NMFS4267-69; Bearded Seal Designation, AR-NMFS4210, AR-NMFS4216-19.

[59] *See* Ringed Seal Designation, AR-NMFS4314-15; Bearded Seal Designation, AR-NMFS4258-59; State of Alaska Comments, AR-PUB14291.

[60] *CBD*, 67 F.4th at 1037.

conservation of a species, it must be more than beneficial."[61]  Here, NMFS erred because each seal's *entire* 160-million-plus-acre designation cannot be *indispensable* to ensuring the conservation of that species.[62]

Indeed, Congress intentionally used the term "critical habitat" to emphasize that designated lands must be necessary to the species' survival, not just beneficial or helpful. Congress criticized the proposed designation of 10 million acres of land as critical habitat for the grizzly bear, stating that "[m]uch of the land involved in this proposed designation is not habitat that is *necessary* for the continued survival of the bear."[63]  Congress's recognition that 10 million acres of land could not possibly be *critical* habitat shows that NMFS's 160-million-acre-plus designations are irreconcilable with Congress' intentional use of the term "*critical* habitat," i.e., those areas that are truly essential to the species' conservation.

At the very least, NMFS erred because it did not explain *why* each massive designation "is essential to [the species'] persistence."[64]  In *Center for Biological Diversity*, the Ninth Circuit, in setting aside critical habitat for the jaguar, explained that the agency's "unexplained assertion that Subunit 4b is essential to jaguar persistence" was not sufficient

_____

[61] *Id.* at 1036-37.

[62] *See id.*

[63] S. Rep. No. 95-874, at 10 (1978); *see also* H.R. Rep. No. 95-1625, at 25 (1978), *reprinted in* 1978 U.S.C.C.A.N. 9453, 9475 (criticizing the Services' regulatory definition of critical habitat because it "could conceivably lead to the designation of virtually all of the habitat of a listed species as its critical habitat").

[64] *CBD*, 67 F.4th at 1046-47.

to support designation of that area.[65]  Additionally, in *Middle Rio Grande Conservancy District v. Babbitt*, the court held the agency erred in concluding that all 163 miles of river was critical habitat when the agency did not analyze whether the entire area was necessary for conservation.[66] The court explained that "while separating out some reaches of the Rio Grande, or segments of some reaches, for critical habitat designation may be painstaking, both the law and the overwhelming consequences of not doing so require it."[67]  As in both *Center for Biological Diversity* and *Middle Rio Grande*, NMFS erred because it did not explain why each Texas-sized designation is essential to the species' conservation.

Furthermore, NMFS erred in this case because it found that each massive 160-million-acre area is "one specific area"[68] that constitutes critical habitat in direct contradiction to the ESA, which limits critical habitat to "*specific areas* within the geographical area occupied by the species."[69]  In fact, NMFS concluded that basically all waters within the seals' range in the U.S. that may contain sea ice constitutes critical habitat.[70]  However, Congress has recognized the Services' previous misuse of the ESA by

---

[65] *Id.*

[66] *Middle Rio Grande Conservancy Dist. v. Babbitt*, 206 F. Supp. 2d 1156, 1186-87 (D.N.M. 2000).

[67] *Id.*

[68] *See* Ringed Seal Designation, AR-NMFS4267; Bearded Seal Designation, AR-NMFS4215.

[69] 16 U.S.C. § 1532(5)(A)(i) (emphasis added).

[70] *See* Ringed Seal Designation, AR-NMFS4261, AR-NMFS4267-69; Bearded Seal Designation, AR-NMFS4210, AR-NMFS4215-18.

18

designating "geographic ranges" rather than "specific areas."[71] The Supreme Court has likewise explained that "[o]nly *certain* areas that are indispensable to the conservation of the endangered species" can constitute "critical habitat."[72] Consequently, NMFS erred in concluding that the bulk of each seals' geographic range in the United States—areas encompassing more than 160 million acres—is "one specific area" or a "certain area" that is indispensable to the species' continued existence.

NMFS also failed to comply with its own regulations. Section 424.12(b) specifies that "[w]here designation of critical habitat is prudent and determinable, the Secretary will *identify specific areas within the geographical area occupied by the species* at the time of listing and any specific areas outside the geographical area occupied by the species to be considered for designation as critical habitat."[73] Again, NMFS's designation of virtually all of the suitable habitat for the species in the U.S. is not identification of "specific areas" and conflicts with § 424.12. NMFS failure to comply with its regulations is reversible error.[74]

Ultimately, the statutory and regulatory text are irreconcilable with NMFS's determination that 160-million-acre-plus areas that encompass virtually the entire U.S.

---

[71] S. Rep. No. 97-418, at 12 (1982) ("When designating critical habitat, the Secretary is expected to comply with the statutory definition and designate 'specific areas.' Several witnesses suggested that instead of such 'specific areas' the Secretary was designating 'geographic ranges.'"). Excerpts attached as **Appendix B**.

[72] *Weyerhaeuser*, 139 S. Ct. at 369.

[73] 50 C.F.R. § 424.12(b).

[74] *CBD*, 67 F.4th at 1042 ("It is well established that 'an agency is to be held to the terms of its regulations.'" (citation omitted)).

ranges of the bearded and ringed seals are "critical" habitat for each species.[75]  The entirety of this massive area cannot be "essential" to the species' conservation, nor is it a "specific area," as the statute and regulations require.  NMFS's designations for the ringed and bearded seal are therefore unlawful.

> **B.  NMFS Failed to Address Why the Critical Habitat Is Indispensable to the Seals' Survival When Substantial Portions of Their Ranges Are Outside of the Designations**

While NMFS's designations of the seals' critical habitat are absurdly large and include virtually all of the species' ranges within the United States, the areas designated also only encompass a small portion of each seal's entire range, revealing that they are not essential to the species' conservation.  In particular, the ringed seal is a circumpolar species, and its range includes the Arctic, Atlantic, and Pacific Oceans—an enormous geographical area that contains millions of square miles.[76]  The global ringed seal population is estimated to be in the millions.[77]  The bearded seal's range is smaller, but it still extends well beyond the designated critical habitat, including portions of the Bering, Chukchi, Beaufort, and

---

[75] *Ariz. Cattle Growers' Ass'n v. U.S. Fish & Wildlife*, 273 F.3d 1229, 1236 (9th Cir. 2001) (stating courts "must not rubber-stamp . . . administrative decisions that they deem inconsistent with a statutory mandate or that frustrate the congressional policy underlying a statute" (alteration in original) (cleaned up)); *Otay Mesa Prop., L.P. v. U.S. Dep't of the Interior*, 344 F. Supp. 3d 355, 364-65 (D.D.C. 2018) (stating courts "must overturn agency action and interpretation inconsistent with the regulations and statutes themselves" (citation omitted)).

[76] Ringed Seal Status Review, AR-REF2036-37.

[77] *Id.*, AR-REF2055, AR-REF2208.

East Siberian Seas (about two times the area designated).[78]  NMFS made no effort to explain why the designated critical habitat is essential, necessary, or indispensable where the designation fails to include substantial portions of the species' Arctic ranges and, in the case of the ringed seal, contains only a small portion of the species' circumpolar range.[79]

Accordingly, NMFS erred because it "fail[ed] to consider an important aspect of the problem, [or] offer[ed] an explanation for its decision that runs counter to the evidence before the agency."[80]  While critical habitat cannot be designated outside of the United States,[81] the vast areas the seals occupy outside the designations show that the designated critical habitat is not truly necessary or indispensable to the seals' continued existence.[82] NMFS, however, failed to consider the existence of these vast areas of occupied habitat when it designated critical habitat.  This error highlights the absurdity of designating critical habitat for species commonly found throughout much of the Arctic, which should never have been listed under the ESA in the first place.

---

[78]  Bearded Seal Designation, AR-NMFS4210; Bearded Seal Status Review, AR-REF1781, AR-REF1809-10, AR-REF1821.

[79] *See CBD*, 67 F.4th at 1045-46 (concluding agency erred in designating critical habitat where most of the species' range was outside the United States and agency failed to explain why protection of habitat in United States was necessary).

[80] *Id.* at 1035 (citation omitted) (second alteration in original).

[81] 50 C.F.R. § 424.12(g).

[82] Ringed Seal Status Review, AR-REF2037; Bearded Seal Status Review, AR-REF1781.

## C. NMFS Improperly Relied on Speculation Regarding the Presence of Essential Habitat Features

In determining the "critical habitat" of a listed species, both the ESA and its implementing regulations require NMFS to identify "the *specific areas* within the geographical area occupied by the species, at the time it is listed . . . *on which are found* those physical or biological features . . . essential to the conservation of the species."[83] Essential features were previously referred to as "primary constituent elements," or "PCEs."[84] Here, NMFS identified sea ice and prey resources as the species' essential habitat features.[85] Thus, to comply with the statute, NMFS had to identify where these essential features are found within the larger occupied area to identify the areas that are critical habitat.

NMFS, however, admitted it could not specify the locations of the essential habitat features. The prey resources are common and found everywhere—"throughout the geographical area occupied by the species," and NMFS admitted that it lacked information suggesting that "any portions of the species' occupied habitat contain prey species that are of greater importance or [that] otherwise differ."[86] NMFS therefore focused on the location

---

[83] 16 U.S.C. § 1532(5)(A)(i); *see* 50 C.F.R. § 424.12(b)(1).

[84] Regulations for Listing Species and Designating Critical Habitat, 84 Fed. Reg. 45,020, 45,023 (Aug. 27, 2019) ("Listing Regulations") (describing abandonment of term "primary constituent elements").

[85] Ringed Seal Designation, AR-NMFS4264-67; Bearded Seal Designation, AR-NMFS4213-15.

[86] Ringed Seal Designation, AR-NMFS4269; Bearded Seal Designation, AR-NMFS4218.

of sea ice.[87]  But NMFS also conceded that it could not specifically identify where the sea ice essential features are located because they "are dynamic and variable on both spatial and temporal scales."[88]  Consequently, "[t]he specific geographic locations of essential sea ice habitat used by [the] seals vary from year to year, or even day to day, depending on many factors."[89]  Further, NMFS stated that it is "impracticable to separately identify specific areas where each of these essential [sea ice] features occur," and it instead used a "coarse scale," which amounted to drawing a line around U.S. jurisdictional waters containing an area the size of Texas.[90]  This gives "coarse scale" an entirely new meaning.

NMFS's analysis "contradicts the express language of the ESA that critical habitat comprises 'specific areas' where 'physical or biological features' 'essential to the conservation of the species' '*are found*.'"[91]  In *Home Builders Association of Northern California*, the FWS erred because it admitted that it did not determine where within the designated area the essential features are found.[92]  Similarly, in *Cape Hatteras Access Preservation Alliance*, the court explained that the requirement that the essential features

---

[87] Ringed Seal Designation, AR-NMFS4269; Bearded Seal Designation, AR-NMFS4218.

[88] Ringed Seal Designation, AR-NMFS4267-68; Bearded Seal Designation, AR-NMFS4246.

[89] Ringed Seal Designation, AR-NMFS4267; Bearded Seal Designation, AR-NMFS4215.

[90] Ringed Seal Designation, AR-NMFS4267; Bearded Seal Designation, AR-NMFS4215.

[91] *Home Builders Ass'n of N. Cal. v. U.S. Fish & Wildlife Serv.*, 268 F. Supp. 2d 1197, 1216 (E.D. Cal. 2003).

[92] *Id.* at 1216-17.

must be "'found' on an area is a prerequisite to designation of that area as critical habitat."[93]

The court therefore rejected the agency's excuses for why it could not ensure the identified essential features were within the designated areas—including, as in this case, that the features were "dynamic," along with lack of data—because its "excuses have no basis in the statute or in cases."[94]  The court further emphasized that the agency "ha[d] previously been critiqued for not mounting the proper effort to ensure that PCEs do exist on designated lands."[95]  Ultimately, the court vacated the designation because designations "must rely on facts in the record and . . . rationally relate to those facts," not merely "rely on hope" and speculation that the identified essential features occur in the area.[96]  At bottom, in designating critical habitat, the agency must identify where the essential features can be found based on evidence in the record.

NMFS's concession that it cannot specify where the essential features are found within the designated area means that it acted "in direct violation of the statute" in designating critical habitat.[97]  As the *Cape Hatteras Access* court explained in vacating the designation there, NMFS's excuse that the features are "dynamic" because sea ice varies "spatiotemporally" does not relieve NMFS of its duty to identify specific areas where the

---

[93] *Cape Hatteras Access Pres. All. v. U.S. Dept. of Interior*, 344 F. Supp. 2d 108, 123 (D.D.C. 2004).

[94] *Id.* at 122-23.

[95] *Id.* at 122.

[96] *Id.* at 122-23.

[97] *Home Builders Ass'n*, 268 F. Supp. 2d at 1216-17.

essential features occur.[98]  In this case, NMFS even rejected comments by the Bureau of Land Management that NMFS should "provide clarity regarding where each essential feature is found, rather than designating critical habitat as a single large unit."[99]  As in both *Home Builders Association* and *Cape Hatteras Access*, where the designations were vacated for failure to identify the location of essential features, here too, vacatur is necessary because NMFS admitted it cannot say where the essential habitat features are located.

Furthermore, "[t]he Secretary is required to define 'primary constituent elements' [i.e., essential habitat features] in a meaningful way and by such definition to limit critical habitat, not to expand it to wherever a potential for commonly occurring constituent elements may take it."[100]  For example, in *Middle Rio Grande*, the court explained that "separating out some reaches of the Rio Grande, or segments of some reaches, for critical habitat designation may be painstaking" but that "both the law and the overwhelming consequences of not doing so require it."[101]  Here, NMFS expanded the designations to over 160 million acres—encompassing virtually all of the seals' U.S. range—by speculating that essential sea ice features *could* be found in these areas while admitting it cannot identify their location.[102]  Just as in *Middle Rio Grande* where the agency erred in

---

[98] Ringed Seal Designation, AR-NMFS4267; Bearded Seal Designation, AR-NMFS4215.

[99] Ringed Seal Designation, AR-NMFS4292; Bearded Seal Designation, AR-NMFS4238.

[100] *Middle Rio Grande*, 206 F. Supp. 2d at 1186.

[101] *Id.* at 1186-87.

[102] Ringed Seal Designation, AR-NMFS4267; Bearded Seal Designation, AR-NMFS4215.

25

designating 163 miles of river without analyzing which portions actually had the essential features,[103] here too, NMFS erred by designating massive areas as critical habitat while admitting that it cannot determine where the essential features are actually found.

Additionally, in making its designation, NMFS must use "the best scientific data available."[104] The Supreme Court has stated that the "obvious purpose" of requiring that NMFS "'use the best scientific and commercial data available' is to ensure that the ESA not be implemented haphazardly, on the basis of speculation or surmise."[105] Congress' use of the virtually indistinguishable phrase "best scientific data available" in Section 4(b)(2) must be given the same effect.[106] In fact, in *Center for Biological Diversity v. U.S. Fish & Wildlife Service*, the Ninth Circuit struck down a critical habitat designation because the agency's reasoning was based on speculation.[107] Here too, in designating critical habitat for the two seals, NMFS's decision improperly relied on speculation.

"The focus must be on PCEs [i.e., essential habitat features], not the current existence of a species in an area."[108] Thus, in *Alaska Oil & Gas Association*, the court concluded that designation of critical habitat for the polar bear was lawful because the

---

[103] *Middle Rio Grande*, 206 F. Supp. 2d at 1186-87.

[104] 16 U.S.C. § 1533(b)(2).

[105] *Bennett v. Spear*, 520 U.S. 154, 176 (1997).

[106] *Ass'n des Éleveurs de Canards et d'Oies du Quebec v. Becerra*, 870 F.3d 1140, 1147 (9th Cir. 2017) (stating courts give same meaning to same term used within statutory scheme).

[107] *CBD*, 67 F.4th at 1039-40; *accord N.M. Farm & Livestock Bureau v. U.S. Dep't of Interior*, 952 F.3d 1216, 1227 (10th Cir. 2020).

[108] *Alaska Oil & Gas Ass'n v. Jewell*, 815 F.3d 544, 556 (9th Cir. 2016).

agency provided scientific analysis, technological data, and other evidence relating to how it determined that there were essential features within the designated areas.[109] Here, in contrast, NMFS offered no evidence concerning the location of the essential features and instead _admitted_ that it cannot say where the essential features occur within the designated area. NMFS instead erroneously focused on whether seals occupy the designated areas, and not on the essential features, as the statute and agency regulations require.

In short, NMFS failed to make the findings required to support a critical habitat designation under the statutory provisions of the ESA and NMFS's regulations governing critical habitat designation.[110] NMFS's reliance on speculation requires vacatur.

### D.  NMFS Failed to Identify Any Physical or Biological Features that May Require Special Management Considerations or Protection

In occupied areas, not only must critical habitat contain the essential habitat features, but those features "may require special management considerations or protection."[111] Under NMFS's regulations, "special management considerations or protection" is defined as "[m]ethods or procedures useful in protecting the physical or biological features essential to the conservation of listed species," previously referred to as PCEs.[112] Thus, NMFS "was required to make a finding, prior to designating [the] particular area as critical habitat, _that the area in question_ might require special management

---

[109] *See id.* at 556-62.

[110] *See CBD*, 67 F.4th at 1046-49.

[111] 16 U.S.C. § 1532(5)(A)(i).

[112] 50 C.F.R. § 424.02.

considerations and protections at some time in the future."[113]  Further, NMFS must "discuss _how_ each identified PCE [i.e., essential habitat feature] would need management or protection."[114]

Here, NMFS erred because it did not specify any special management considerations or protections the designated area may require in the future.[115]  NMFS indicated that sea ice and prey resources are the essential habitat features.[116]  But NMFS did not explain what special management considerations and procedures in the designated area may be needed to preserve the sea ice or prey resources.  NMFS's failure to do this analysis likely stems from the enormous size of the area it designated, making it impossible to analyze what special management considerations or protections might be required.

Indeed, NMFS's reasoning is deficient because it merely "identified four primary sources of potential threats" to the essential features: climate change, oil and gas exploration, development and production activities, marine shipping and transportation, and commercial fisheries.[117]  As the court explained in _Cape Hatteras Access_, the

---

[113] _Home Builders Ass'n_, 268 F. Supp. 2d at 1218; _accord Cape Hatteras Access_, 344 F. Supp. 2d at 124 ("Rather than discuss how each identified PCE would need management or protection, the Service lists activities that once resulted in consultations and makes a conclusory statement that dredging or shoreline management could result in permanent habitat loss.").

[114] _Cape Hatteras Access_, 344 F. Supp. 2d at 124 (emphasis added).

[115] _See id._

[116] Ringed Seal Designation, AR-NMFS4264-67; Bearded Seal Designation, AR-NMFS4213-15.

[117] Ringed Seal Designation, AR-NMFS4269-72; Bearded Seal Designation, NMFS4218-20.

identification of potential threats to the essential features—as NMFS did here—is not sufficient to show that special management considerations or protections may be required.[118]  Rather, NMFS must "discuss _how_ each identified PCE [i.e., essential habitat feature] would need management or protection."[119]  NMFS erred by failing to do this analysis.[120]

Remarkably, NMFS also emphasized that the designation of critical habitat is not expected to result in any project modifications or impose other requirements to avoid adverse modification of the essential habitat features.[121]  In that case, either no special management considerations or protections will be needed or the threats to the essential habitat features cannot be addressed through management actions resulting from Section 7 consultation.  Regardless, NMFS has effectively conceded that the critical habitat designations are redundant and unnecessary.

In sum, NMFS abused its discretion in concluding that special management considerations or protection may be required to protect essential features without providing a legitimate basis for such a finding.

---

[118] _See Cape Hatteras Access_, 344 F. Supp. 2d at 124.

[119] _Id._ (emphasis added).

[120] _Id._

[121] _E.g._, Ringed Seal Designation, AR-NMFS4274, AR-NMFS4278; Bearded Seal Designation, AR-NMFS4222, AR-NMFS4225.

### E. NMFS Failed to Analyze Whether Designation Is Prudent

The ESA provides that NMFS may only designate critical habitat "to the maximum extent prudent."[122]  Thus, critical habitat must be designated for a species at the time of listing *only* when it is prudent to do so.[123]  "Prudent" means "having or showing good judgment and restraint especially in conduct or speech."[124]  Thus, as NMFS explained in a recent rulemaking, "Congress recognized that not all listed species would be conserved by, or benefit from, the designation of critical habitat," i.e., designation may not be prudent.[125] NMFS's regulations likewise provide that NMFS can only "propose and finalize critical habitat designations" "[t]o the maximum extent prudent."[126]  Pursuant to the plain meaning of these statutory and regulatory provisions, NMFS must be prudent—i.e., use restraint— in making critical habitat designations.

Here, NMFS erred because it did not make a specific prudency determination in the final critical habitat rules.  The agency instead brushed the issue off in responding to comments and improperly and incorrectly dismissed whether the designations were prudent without any analysis.[127]

---

[122] 16 U.S.C. § 1533(a)(3)(A).

[123] *Id.*; *see also Middle Rio Grande*, 206 F. Supp. 2d at 1186-87 (reversing designation where it was not clear designation was prudent).

[124] Prudent, *Merriam-Webster*, https://www.merriam-webster.com/thesaurus/prudent (last visited Sept. 28, 2023).

[125] Listing Regulations, 84 Fed. Reg. at 45,040.

[126] 50 C.F.R. § 424.12(a).

[127] Ringed Seal Designation, AR-NMFS4307; Bearded Seal Designation, AR-NMFS4250.

Indeed, if NMFS does not need to evaluate the prudency of the designations, then the statutory and regulatory language directing NMFS to only designate critical habitat to the "maximum extent prudent" is deprived of meaning. This language only makes sense and has meaning if it is read as a limitation on designation that NMFS must consider before designation. NMFS cannot read this language out of the statute by ignoring it.[128]

That the regulation provides that NMFS "_may_, but is not required to, determine that a designation would not be prudent"[129] under the listed circumstances does not mean that NMFS does not need to evaluate whether the listed circumstances apply. The discretion to make a not-prudent determination does not eliminate the need for NMFS to find that designation is prudent _before_ designation, as the ESA's plain language requires.

Even where an agency has discretion, the courts must still decide "whether the decision was based on a consideration of the _relevant factors_ and whether there has been a clear error of judgment."[130] Section 424.12(a)(1) provides factors that relate to whether designation is prudent, a necessary finding NMFS must make to comply with the plain language of the statute. To the extent NMFS believes it can simply ignore the prudency requirement, the agency is wrong. The Supreme Court in _Weyerhaeuser_ recently rejected the same argument.[131] Because NMFS did not analyze whether designation was prudent

---

[128] _Murphy Co. v. Biden_, 65 F.4th 1122, 1134 (9th Cir. 2023) (stating "'cardinal principle' of interpretation [is] that courts must give effect, if possible, to every clause and word of a statute" (cleaned up)).

[129] 50 C.F.R. § 424.12(a)(1).

[130] _Weyerhaeuser_, 139 S. Ct. at 371 (citation omitted).

[131] _Id._ at 371-72.

pursuant to § 1533(a)(3) and § 424.12(a)(1), NMFS erred by failing to consider the relevant factors in making its decisions to designate critical habitat.[132]

Indeed, had NMFS performed the prudency analysis required by § 1533(a)(3) and § 424.12(a)(1), it would have been unable to designate here. The record indisputably supports that designation is not prudent here under § 424.12(a)(1). Section 424.12(a)(1) identifies six different circumstances in which designation of critical habitat would not be prudent. But NMFS did not evaluate any of these specific circumstances and explain why they do not apply. At the very least, two of the six circumstances identified in the regulation are clearly applicable here such that NMFS should have analyzed them.

First, it is not prudent to designate critical habitat when "[a]reas within the jurisdiction of the United States provide no more than negligible conservation value, if any, for a species occurring primarily outside the jurisdiction of the United States."[133] As explained above, both seal species, and the ringed seal in particular, have large populations and extensive habitat outside the jurisdiction of the United States, and therefore the relative conservation value of the critical habitat within U.S. jurisdiction should be assessed.[134]

Second, designation is not prudent when "threats to the species' habitat stem solely from causes that cannot be addressed through management actions resulting from

---

[132] *See id.*

[133] 50 C.F.R. § 424.12(a)(1)(iii).

[134] Bearded Seal Status Review, AR-NMFS1781 (bearded seal habitat); Ringed Seal Status Review, AR-REF2037 (ringed seal habitat); Nelson et al., *supra*, AR-REF20686 (ringed seal and bearded seal population estimates).

consultations under section 7(a)(2) of the Act."[135]  NMFS conceded that the designation of critical habitat is unlikely to result in project modifications or impose additional requirements on resource users through the Section 7 consultation process.[136]  Thus, threats to the species' habitat cannot be addressed or managed through future Section 7 consultations, and therefore designation is not prudent.

Even setting aside the regulatory provisions, NMFS failed to ensure the entirety of the massive areas designated as critical habitat are actually necessary for conservation, i.e., prudent, in conformity with the statute.  In *Middle Rio Grande*, the court concluded that the "failure to examine every portion of the river or consider designation of less than all four reaches is not prudent" where there was significant impact of designating the middle reach of the river and failure to clarify the species' "most essential needs."[137]  Likewise here, the designations will impact the North Slope oil and gas industry as well as the transportation industry that Alaskans and the state's economy depend on.[138]  Yet NMFS conceded it did not "separately identify specific areas" within the vast designations where the species' essential habitat features could be found.[139]  It further admitted that designation will not provide any additional protection beyond listing and the Marine Mammal

---

[135]  50 C.F.R. § 424.12(a)(1)(ii).

[136]  *E.g.*, Ringed Seal Designation, AR-NMFS4274, AR-NMFS4278; Bearded Seal Designation, AR-NMFS4222, AR-NMFS4225.

[137]  *Middle Rio Grande*, 206 F. Supp. 2d at 1186.

[138]  *See* State of Alaska Comments, AR-PUB14284-88.

[139]  Ringed Seal Designation, AR-NMFS4267; Bearded Seal Designation, AR-NMFS4215.

33

Protection Act ("MMPA").[140]  Just as in *Middle Rio Grande* where the agency's designation was not prudent because it provided no specifics as to why designation of the entire 163 miles of river was necessary,[141] here too, NMFS's vague explanation of why over 160 million acres of critical habitat is necessary for each species despite the potential impact on the economy of the North Slope shows that designation is not prudent.

Ultimately, the problems with the designations here stem from NMFS's decision to list the bearded and ringed seals based on circumstances that are not projected to occur until after mid-century at the earliest.  Presently, however, each species is abundant and has an extensive range.[142] This reality makes it impossible to meaningful analyze what portions of the seals' ranges are critical habitat and supports finding that critical habitat designation is not currently prudent.

The bottom line is that NMFS failed to review the relevant factors and explain why these extraordinarily large critical habitat designations are prudent.  The record supports a not-prudent finding.  Therefore, NMFS abused its discretion and made a clear error in judgment.[143]

---

[140] *E.g.*, Ringed Seal Designation, AR-NMFS4274, AR-NMFS4305; Bearded Seal Designation, AR-NMFS4222, AR-NMFS4248.

[141] *Middle Rio Grande*, 206 F. Supp. 2d at 1179-80, 1186-87.

[142] *See*, *e.g.*, Mark A. Nelson et al., *supra*, AR-REF20686; Ringed Seal Status Review, AR-REF2037, AR-REF2054-58; Bearded Seal Status Review, AR-REF1781, AR-REF1809-1810.

[143] *Weyerhaeuser*, 139 S. Ct. at 371.

**F.    NMFS Failed to Properly Consider the Economic Impacts of the Critical Habitat Designations and Determine Whether to Exclude Particular Areas**

As previously noted, ESA Section 4(b)(2) requires NMFS to "tak[e] into consideration the economic impact . . . of specifying any particular area as critical habitat," and authorizes NMFS to "exclude any area from critical habitat if [the agency] determines that the benefits of such exclusion outweigh the benefits of specifying such area as part of the critical habitat."[144]  The Supreme Court has explained that Section 4(b)(2) "requires [NMFS] to consider economic impact and relative benefits before deciding whether to exclude an area from critical habitat or to proceed with designation."[145]

Section 4(b)(2) was part of Congress's 1978 ESA Amendments.  It was added to provide greater flexibility and reduce conflicts between critical habitat and land and resource uses by requiring non-biological factors to be taken into account when critical habitat is designated.  Congress explained that under Section 4(b)(2), "Factors of recognized or potential importance to human activities in an area will be considered by [NMFS] in deciding whether or not all or part of that area should be included in the critical habitat."[146]  Under the analysis required by Section 4(b)(2), "in some situations, the resultant critical habitat will be different from that which would have been established

---

[144] 16 U.S.C. § 1533(b)(2).

[145] *Weyerhaeuser*, 139 U.S. at 371.

[146] H.R. Rep. No. 95-1625, at 17 (1978), *reprinted in* 1978 U.S.C.C.A.N. 9453, 9467.

using solely biological criteria.  In some situations, no critical habitat would be specified."[147]

In this case, NMFS erred both in its consideration of the economic impacts of the seals' critical habitat designations and whether to exclude areas from the designations to avoid future resource conflicts.  As NMFS explained in the critical habitat rules, once designated, critical habitat primarily impacts land and resources uses through the requirements imposed by ESA Section 7(a)(2).[148]  That provision requires federal agencies to ensure that any action authorized, funded, or carried out by the agency is not likely to jeopardize the continued existence of any listed species or destroy or adversely modify the species' critical habitat.[149]  To comply with this requirement, federal agencies must consult with NMFS (in the case of marine species) and if the proposed action may adversely affect the species _or_ its critical habitat, obtain a written biological opinion describing the impacts of the action.  If the proposed action would jeopardize the species or adversely modify its critical habitat, the action must be modified to avoid jeopardy or adverse modification, or the action cannot proceed.[150]

---

[147] *Id.*; *see also* H.R. Rep. No. 96-167, at 7 (1979), *reprinted in* 1979 U.S.C.C.A.N. 2557, 2563 ("One of the changes made by the 1978 amendments . . . is the requirement that economics and other factors be considered prior to designating critical habitat").

[148] Ringed Seal Designation, AR-NMFS4273; Bearded Seal Designation, AR-NMFS4222.

[149] 16 U.S.C. § 1536(a)(2); *see also* Ringed Seal Designation, AR-NMFS4278 (describing the effects of critical habitat designation); Bearded Seal Designation, AR-NMFS4224 (same).

[150] 16 U.S.C. § 1536(b); 50 C.F.R. § 402.14 (requirements for formal consultation); *see also* Ringed Seal Designation, AR-NMFS4278; Bearded Seal Designation, AR-

36

In designating the seals' critical habitat, NMFS identified specific activities that may adversely modify critical habitat or otherwise be affected by the designation pursuant to Section 4(b)(8).[151] The agency explained that a "variety of activities" may adversely affect the critical habitat, including "[i]n-water and coastal construction; activities that generate water pollution; dredging; commercial fishing; oil and gas exploration, development, and production; oil spill response; and certain military readiness activities."[152] Moreover, in addressing the definitional requirement that the seals' essential habitat features may require special management consideration or protection, NMFS identified four "primary sources of potential threats": climate change, oil and gas exploration, development, and production in the U.S. Arctic, marine shipping and transportation, and commercial fisheries.[153]

These economic activities are critical to the economy of Alaska's North Slope and to the State generally, as explained in Alaska's comments and the comments of North Slope Borough.[154] Because of the impacts of the critical habitat designations on important economic activities, and in particular oil and gas leasing, exploration, development and

NMFS4224; *Nat'l Res. Def, Council v. Jewell*, 749 F.3d 776, 779-80 (9th Cir. 2014) (en banc) (summarizing Section 7 consultation requirements).

[151] *See* 16 U.S.C. § 1533(b)(8).

[152] Ringed Seal Designation, AR-NMFS4278-79; Bearded Seal Designation, AR-NMFS4224-25.

[153] Ringed Seal Designation, AR-NMFS4269-72; Bearded Seal Designation, AR-NMFS4218-20; *see also* 16 U.S.C. § 1532(5)(A)(i) (definition of occupied critical habitat).

[154] State of Alaska Comments, AR-PUB14284-88; North Slope Borough Comments, AR-PUB14236-40, AR-PUB14537-40.

production,[155] the State urged NMFS to exclude from critical habitat a 20-mile buffer zone around communities and along the Beaufort Sea coast.[156]  North Slope Borough similarly requested exclusion of a 10-mile buffer zone around all North Slope villages and all lands conveyed to the Borough or to Alaskan Native corporations, along with shipping lanes needed for the transportation of good and services to and from North Slope communities.[157]

NMFS, however, failed to meaningfully consider the economic and other impacts prior to designating the critical habitat.  Most obviously, the two 160-million-acre-plus designations were simply too enormous.  It defies credulity that NMFS carefully evaluated whether the benefits of designating one "specific area" containing over 160 million acres as critical habitat outweighed the designation's future economic impacts.  Instead, the agency simply assumed that no project modifications or other restrictions would ever be imposed on activities within critical habitat because impacts to habitat would be subsumed into the Section 7 "jeopardy" analysis.  For example, NFMS stated:

> [W]e have not identified any likely incremental economic impacts associated with project modifications that would be required solely to avoid impacts to Arctic ringed seal [or bearded seal] critical habitat.  The critical habitat designation is not likely to result in more requested project modifications because our section 7 consultations on potential effects to [the] seals and our incidental take authorizations for Arctic activities under section 101(a) of the [MMPA] both typically address habitat-associated effects to the seals even in the absence of a critical habitat designation. . . .  [B]ased on the best information available for the 10-year period of the analysis, it is likely that any project modifications necessary to avoid impacts to Arctic ringed seal

---

[155] *See* State of Alaska Comments, AR-PUB14286-88 (discussing the importance of, and federal policies supporting, development of oil and gas resources, as well as critical minerals, including undiscovered resources off the U.S. Arctic coast).

[156] *Id.*, AR-PUB14301.

[157] North Slope Borough Comments, AR-PUB14239-40, AR-PUB14540.

[or bearded seal] critical habitat would also be necessary to avoid impacts to the species in section 7 consultations that would occur irrespective of this designation.[158]

At bottom, NMFS admitted it did not do the required balancing because it improperly assumed the designations will have no effect.

Indeed, if the designations have no impact whatsoever, then designation is not prudent, as discussed. However, if they have an effect such that designation is prudent, then NMFS must do the work and analyze whether exclusion of certain areas is warranted when weighing the costs and benefits of exclusion.

NMFS did not adequately address the State's concern that the designations would have adverse consequences on oil and gas exploration and development on the North Slope and the adjacent offshore areas of the Beaufort and Chukchi Seas. In fact, NMFS appears to have targeted the North Slope oil and gas industry, stating at one point that the "primary industrial activities occurring within [the seals'] critical habitat are associated with the oil and gas industry," while asserting that exclusions around these activities are "not appropriate."[159] At the same time, the agency maintained that the presence of critical habitat will not result in any modifications to oil and gas-related activities beyond those already required to address impacts to the species under the Section 7 jeopardy standard.[160]

---

[158] Ringed Seal Designation, AR-NMFS4274; *see* Bearded Seal Designation, AR-NMFS4222.

[159] Ringed Seal Designation, AR-NMFS4306; Bearded Seal Designation, AR-NMFS4249.

[160] *E.g.*, Ringed Seal Designation, AR-NMFS4274, 4299; Bearded Seal Designation, AR-NMFS4222, AR-NMFS4243.

39

This conclusion was illogical and shows the lack of a legitimate analysis of economic impacts.

On the other hand, NMFS could not identify any credible benefits from not excluding these areas. The primary benefit of critical habitat does not apply in this case—protections imposed through Section 7 consultation, as NMFS emphasized in its summary dismissal of economic impacts. NMFS instead briefly listed a series of strained and speculative benefits that have little to do with the purpose of designating critical habitat. These included providing "public notice" of the areas essential to the conservation of the species and the essential habitat features—sea ice.[161] Any benefit from this "notice" is questionable at best, given that the seals were listed as threatened species in 2012 due to projected sea ice losses, and federal agencies and non-federal project proponents have been consulting with NMFS ever since. Similarly, NMFS suggested that the designations will "focus future section 7 consultations on key habitat attributes."[162] But elsewhere—and repeatedly—NMFS maintained that Section 7 consultations already focus on habitat-related effects to seals.[163] Other purported benefits amounted to speculation about what various third parties might do in the future, such as voluntary actions that might be taken by state and local governments, and potential ancillary "welfare benefits" for the human

---

[161] Ringed Seal Designation, AR-NMFS4273; Bearded Seal Designation, AR-NMFS4222.

[162] Ringed Seal Designation, AR-NMFS4285; Bearded Seal Designation, AR-NMFS4232.

[163] *See*, *e.g.*, Ringed Seal Designation, AR-NMFS4298, NMFS4305; Bearded Seal Designation, AR-NMFS4243, NMFS4248.

population or other wildlife species.[164] Again, these alleged benefits result from protecting habitat for species that, according to NMFS, is already adequately protected. And, not surprisingly given their speculative nature, NMFS did not attempt to monetize or quantify these benefits so that they could be weighed against the economic costs.[165]

Second, and relatedly, NMFS incorrectly believed that it had discretion to refuse to analyze whether to exclude areas from the designation, despite legitimate requests by the State and others.[166] NMFS stated that it is "not exercising [its] discretion to further consider and weigh the benefits of excluding any particular area based on economic impacts against the benefits of designation."[167] But NMFS must do just that under Section 4(b)(2)—evaluate "whether to exclude an area from critical habitat" based on the relative benefits compared to the economic impacts.[168] The Supreme Court has explicitly rejected the argument that the agency has discretion to refuse to analyze whether to exclude an area from a critical habitat designation.[169] NMFS's refusal to consider requests for exclusion is particularly troubling here, because NMFS has emphasized that the designation of critical

---

[164] Ringed Seal Designation, AR-NMFS4273; Bearded Seal Designation, AR-NMFS4222.

[165] Ringed Seal Designation, AR-NMFS4273-74; Bearded Seal Designation, AR-NMFS4222-23.

[166] Ringed Seal Designation, AR-NMFS4274, AR-NMFS4306, AR-NMFS4307; Bearded Seal Designation, AR-NMFS4223, AR-NMFS4249, AR-NMFS4250.

[167] Ringed Seal Designation, AR-NMFS4274; Bearded Seal Designation, AR-NMFS422387.

[168] *Weyerhaeuser*, 139 S. Ct. at 371.

[169] *Id.* ("Section 4(b)(2) . . . directs the Secretary to consider the economic and other impacts of designation when making his exclusion decisions.").

habitat will not result in future project modifications,[170] and asserted that even without critical habitat, the seals will receive a "high level of existing baseline protections,"[171] again suggesting that the designations were not prudent in the first place.

The bottom line is that NMFS did not meet the "'categorical requirement' that [it] 'tak[e] into consideration' [these] economic and other impacts before" making the critical habitat designations because its analysis was necessarily vague and unfocussed given the 160-million-plus-acre designations it made.[172] "Consideration" means "continuous and careful thought" or "a matter weighed or taken into account when formulating an opinion or plan."[173] NMFS's cursory evaluations, which marginalized the economic impacts of designating, on a combined basis, _over 200 million acres_ of Alaskan waters as critical habitat, cannot constitute the required "careful thought" that Section 4(b)(2) requires.

## V. CONCLUSION

NMFS's unprecedented designations of over 160 million acres of critical habitat for the ringed seal and the bearded seal cannot be squared with the applicable statutory and regulatory requirements. These massive areas cannot logically constitute a "specific area" that is "essential," i.e., indispensable, to the seals' conservation, especially given the species' extensive ranges and large populations outside U.S. jurisdiction. Further, NMFS

---

[170] Ringed Seal Designation, AR-NMFS4274, NMFS4298, NMFS4299; Bearded Seal Designation, AR-NMFS4222-23, NMFS4248, NMFS4249.

[171] Ringed Seal Designation, AR-NMFS4320; Bearded Seal Designation, AR-NMFS4247.

[172] _Weyerhaeuser_, 139 S. Ct. at 371.

[173] _Consideration_, Merriam-Webster, https://www.merriam-webster.com/dictionary/consideration (last visited Sept. 28, 2023).

conceded it could not provide the locations of the seals' essential habitat features within this massive area, nor could the agency identify how it was going to implement "special management protections" for the essential habitat features of sea ice and prey resources—two findings that are required to designate critical habitat.

Moreover, NMFS asserted that the designations will not lead to project modifications to protect the species' habitat beyond the protections already being provided due to the seals' listings and incidental take authorizations issued under the MMPA. Yet NMFS also assumed, with no credible analysis, that designations were prudent. Either (1) the designations will result in restrictions on economic activities, thereby requiring a balancing of costs and benefits to be done, or (2) the designations do nothing and are not prudent.

In short, NMFS's critical habitat designations are grossly excessive and supported by explanations that conflict with the ESA and its implementing regulations, are based on speculative assumptions, and contain internal inconsistencies. Therefore, the designations violate the ESA and the APA and must be vacated.

RESPECTFULLY SUBMITTED this 29th day of September, 2023.

FENNEMORE CRAIG, P.C.

By */s/ Norman D. James*
Norman D. James
Tyler D. Carlton

*Attorneys for Plaintiffs*

43

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Rule 7.4(a)(3), Plaintiffs certify that Plaintiff's Opening Brief uses a proportionately spaced typeface of 13 points and is double-spaced using a Times New Roman font and that the brief contains 9,999 words, excluding the sections specified in Local Rule 7.4(a)(4), and does not exceed the 10,000 word limit.

By  */s/ Norman D. James*

# Appendix A

# Calendar No. 804

95TH CONGRESS } SENATE { REPORT
2d Session } { No. 95–874

## ENDANGERED SPECIES ACT AMENDMENTS OF 1978

MAY 15 (legislative day, APRIL 24), 1978.—Ordered to be printed

Mr. CULVER, from the Committee on Environment and Public Works, submitted the following

## REPORT

[To accompany S. 2899]

The Committee on Environment and Public Works, to which was referred the bill (S. 2899) to amend the Endangered Species Act of 1973 to establish an Endangered Species Interagency Committee to review certain actions to determine whether exemptions from certain requirements of that Act should be granted for such actions having considered the same, reports favorably thereon with amendments and recommends that the bill as amended do pass.

### GENERAL STATEMENT

The Endangered Species Act of 1973 is the first statute to authorize a comprehensive national program for the conservation of endangered or threatened species of fish, wildlife, and plants.

The regulatory mechanism provided to achieve this goal authorizes and directs the Secretary of the Interior and, for marine species, the Secretary of Commerce to list and to issue regulations for the protection of endangered or threatened species. The Secretary is required to enter into cooperative agreements with, and provide technical and financial assistance to, qualified States for species conservation programs.

Since protection of habitat is a key element in the protection of all species, the act authorizes the Secretary to acquire land for the conservation and propagation of affected species. Furthermore, in section 7 each Federal agency is directed to assure that its actions do not adversely affect listed species or the habitat which the Secretary determines to be critical to their existence. Similarly, section 9 prohibits the taking of, or interstate commerce in, endangered or threatened species except when such use is consistent with a permit or regulations issued by the Secretary to the appropriate State authority.

Case 3:23-cv-00032-SLG   Document 27   Filed 09/29/23   Page 51 of 56

The bill provides authority for the Endangered Species Committee to issue subpenas for the attendance of witnesses and the production of relevant papers, books, and documents. The authority should be used with restraint, when necessary to obtain information material to an exemption decision. If a private party withdraws from seeking a Federal action under consideration for an exemption under these amendments, the subpena power would no longer need to apply to such private party.

## OTHER PROVISIONS

### RAPTORS

During the past 15 years biologists, conservationists, and falconers have been working to produce raptors through propagation in captivity. In this work an emphasis has been placed on raptors which are now listed as endangered under the authority of the Endangered Species Act. However, prohibitions contained in section 9 of the law against commerce in endangered species have impeded these breeding activities.

S. 2899 amends section 9 of the act to clarify the situation regarding domestic, captive-produced raptors. For the purpose of this amendment, raptor means any bird of prey.

Unless specified in other laws, raptors held prior to the enactment of the act on December 28, 1973 are exempted from the provisions and prohibitions of the act. It is the intent of the committee that the domestic captive-produced progeny of any raptor which was legally held prior to enactment will also be exempt from the provisions and prohibitions of the act, even if such progeny were produced after December 28, 1973.

In order to encourage breeding of raptors in captivity, the domestic captive-produced progeny of raptors considered to be endangered, but legally taken from the wild after December 28, 1973, shall be considered for legal purposes in a like manner as the progeny of raptors captured before 1973. The committee believes this will alleviate some of the human pressures on wild raptor populations, will increase genetic diversity in captive populations, and will further encourage captive production of raptors for conservation, scientific, and breeding purposes.

Further, it is the intent of the committee that where domestic captive-bred raptors have been intentionally released and returned to a wild state for conservation and reintroduction purposes, these raptors will be considered to be fully protected under the act.

The Secretary may require the owners of all exempted raptors to keep records and require bands or other permanent markings to distinguish them from wild birds. The records and inventories may be inspected by agents of the Secretary at reasonable times. These records, permanent markers and inventory procedures should not unnecessarily duplicate those now required annually under the Migratory Bird Treaty Act for special purpose permits and falconer permits.

In oversight hearings concerning the Endangered Species Act the committee also received testimony from organizations representing zoos. These witnesses were skeptical of the necessity for the stringent and burdensome process developed by the Fish and Wildlife Service for regulation of their captive bred endangered and threatened species. The committee advises the Service to reexamine these regulations and the rationale upon which they are based on light of this testimony, and to make every effort to ensure that only those regulations which result in real benefits for wild populations of endangered and threatened species are retained. In any event, every effort should be made by the Service to reduce the amount of paperwork and time involved in this regulatory process.

The committee notes favorably the Fish and Wildlife Service announcement in the April 14, 1978, Federal Register that they are examining the possibility of reclassifying captive endangered species to a less restrictive status under the Endangered Species Act. The committee agrees that some distinctions ought to be made between the regulatory processes relating to captive endangered species as opposed to wild populations of that same species. The committee recommends that the Service thoroughly examine the available alternatives and then reform the regulatory process concerning captive endangered species so that only those regulations that can be reasonably expected to enhance the protection of endangered species be retained.

The committee also received testimony on a related issue, the manner in which the Endangered Species Act affects scientific pursuits, particularly work carried on in museums. In discussions with members of the scientific communities the Fish and Wildlife Service has agreed to reexamine its present regulations. The permit procedures in this regard badly need to be streamlined.

Large amounts of time and money have been committed to compliance with these regulations, although little may be accomplished by control of museum specimens. There is little evidence that such controls have any appreciable effect on existing populations of endangered species.

The committee believes that a distinction should be made between regulation of legitimate scientific pursuits and commercial activities involving endangered species, and that regulations should be promulgated which do not unnecessarily impede or obstruct legitimate scientific inquiries.

The committee requests that the Fish and Wildlife Service study upgrading the efforts of the Customs Service activities and other alternatives for monitoring and protecting endangered species and report its findings back to the committee within a reasonable time.

### CRITICAL HABITAT DESIGNATION AND PROTECTION

It has come to the committee's attention that under present regulations the Fish and Wildlife Service is now using the same criteria for

designating and protecting areas to extend the range of an endangered species as are being used in designation and protection of those areas which are truly critical to the continued existence of a species. The committee feels that the rationale for this policy ought to be re-examined by the Fish and Wildlife Service. There seems to be little or no reason to give exactly the same status to lands needed for population expansion as is given to those lands which are critical to a species continued survival.

The committee is particularly concerned about the implications of this policy when extremely large land areas are involved in a critical habitat designation. For example, as much as 10 million acres of Forest Service land is involved in the critical habitat being proposed for the grizzly bear in three Western States. Much of the land involved in this proposed designation is not habitat that is necessary for the continued survival of the bear. It instead is being designated so that the present population within the true critical habitat can expand. The goal of expanding existing populations of endangered species in order that they might be delisted is understandable. This process does, however, substantially increase the amount of area involved in critical habitat designation and therefore increases proportionately the area that is subject to the regulations and prohibitions which apply to critical habitats.

In many cases the Fish and Wildlife Service has been unable to explain fully or predict what the impacts of a critical habitat designation are going to be on activities which occur within a designated critical habitat. This is the case with the grizzly bear critical habitat. Certain adjustments must be made in planned activities, especially in habitat necessary for the continued survival of a species but identical adjustments may not be necessary on expansion lands.

The committee directs that the Fish and Wildlife Service examine this ambiguity in its regulatory process for critical habitat designations. Hopefully this review will be accomplished and a report delivered to this committee before a final decision is made on the grizzly bear designation.

### ROLLCALL VOTES

Section 133 of the Legislative Reorganization Act of 1970 and the rules of the Committee on Environment and Public Works require that any rollcall votes taken during consideration of this bill be announced in this report.

There were two rollcall votes during the committee's consideration of the bill. The results were announced at the time of the vote. The committee ordered the bill reported by unanimous voice vote.

### EVALUATION OF REGULATORY IMPACTS

In compliance with paragraph 5 of rule XXIX of the Standing Rules of the Senate, the committee makes the following evaluation of the regulatory impact of the reported bill.

The reported bill does not add to or reduce the regulatory authority provided by existing law.

The bill has no impact on the personal privacy of individuals.

The bill has an impact on paperwork to the extent that Federal agencies must submit information to the Endangered Species Committee concerning actions which they authorize, fund or carry out which are under consideration by the committee.

There is no specific economic impact of the bill.

The bill has an impact on recordkeeping requirements to the extent that individuals with captive produced raptors are required by the Secretary of the Interior to keep records in addition to those required by existing law.

### ESTIMATES OF COST

Section 252(a)(1) of the Legislative Reorganization Act of 1970 requires publication in this report of the committee's estimate of the costs of the reported legislation, together with estimates prepared by any Federal agency. S. 2899 provides a total authorization of $75 million for the Department of the Interior and $9 million for the Department of Commerce, while an authorization of $7.5 million is provided for the Endangered Species Committee. This compares to an estimate of $17 million by the Department of the Interior and $2.5 million by the Department of Commerce.

CONGRESSIONAL BUDGET OFFICE,
U.S. CONGRESS,
*Washington, D.C., May 12, 1978.*

Hon. JENNINGS RANDOLPH,
*Chairman, Committee on Environment and Public Works,*
*U.S. Senate, Washington, D.C.*

DEAR MR. CHAIRMAN: Pursuant to section 403 of the Congressional Budget Act of 1974, the Congressional Budget Office has prepared the attached cost estimate for S. 2899, the Endangered Species Act Amendments of 1978.

Should the committee so desire, we would be pleased to provide further details on the attached cost estimate.

Sincerely,
JAMES BLUM
(For Robert A. Levine, Deputy Director).

CONGRESSIONAL BUDGET OFFICE—COST ESTIMATE

MAY 12, 1978.

1. Bill number: S. 2899.
2. Bill title: Endangered Species Act Amendments of 1978.
3. Bill status: As ordered reported by the Senate Committee on Environment and Public Works, May 11, 1978.
4. Bill purpose: The bill authorizes appropriations to the U.S. Fish and Wildlife Service (USFWS) of $23 million in fiscal year 1979, $25 million in fiscal year 1980, and $27 million in fiscal year 1981.

The bill also provides authorizations of $2.5 million in each of the fiscal years 1979, 1980 and 1981 to the Department of the Interior for the Endangered Species Committee, which is established in this bill. The bill specifies that the committee would approve federal agency actions when it determines that the action does not jeopardize the continued existence of any endangered or threatened species or the action

# Appendix B

| 97TH CONGRESS<br>*2d Session* | SENATE | REPORT<br>No. 97–418 |
|---|---|---|

# ENDANGERED SPECIES ACT AMENDMENTS OF 1982

MAY 26 (legislative day, MAY 25), 1982.—Ordered to be printed

Mr. CHAFEE, from the Committee on Environment and Public Works, submitted the following

## REPORT

[To accompany S. 2309]

The Committee on Environment and Public Works, to which was referred the bill (S. 2309) to authorize appropriations carry out the provisions of the Endangered Species Act of 1973 for fiscal years 1983, 1984, and 1985, and for other purposes having considered the same, reports favorably thereon with amendments and an amendment to the title and recommends that the bill (as amended) do pass.

### GENERAL STATEMENT

The Endangered Species Act of 1973 (ESA or the Act) as amended, is the first comprehensive legislation enacted to conserve endangered and threatened species and their habitat. However, development of the current ESA programs to conserve endangered and threatened species can be traced back to 1966.

The first legislation enacted specifically to protect endangered species was the Endangered Species Preservation Act of 1966 (P.L. 89–669). The 1966 Act contained four important provisions. First, it directed the Secretary of the Interior to "carry out a program in the United States of conserving, protecting, restoring and propagating selected species of native fish and wildlife." Second, it authorized the acquisition of endangered species habitat for inclusion in the National Wildlife Refuge System using funds up to $15 million from the Land and Water Conservation Fund, provided that no more than $750,000 be spent on any one area. Third, it required the preparation of an official list of endangered species. Fourth, it declared that the Departments of Interior, Agriculture, and Defense shall seek to protect species of native fish and wildlife threatened with extinction and shall preserve their habitat on lands under their jurisdiction if it is practicable and consistent with the primary purposes of the Departments' agencies.

Case 3:23-cv-00032-SLG   Document 27   Filed 09/29/23   Page 55 of 56

When designating critical habitat, the Secretary is expected to comply with the statutory definition and to designate "specific areas." Several witnesses suggested that instead of designating such "specific areas" the Secretary was designating "geographical ranges." Section 3(5)(c) of the Act states as a general rule that "critical habitat shall not include the entire geographical area which can be occupied by the threatened or endangered species."

Section 4(a)(3) of the proposed amendments to the listing process makes clear that listing determinations must be based solely on the factor set forth in section 4(a)(1) of the Act. This amendment would preclude the Secretary from considering economic or other non-biological factors in determining whether a species should be listed or delisted. Listings or delistings must be based solely on biological considerations. Only in this way will the endangered and threatened species lists accurately reflect those species that are or are likely to be in danger of extinction.

The proposed amendments would continue to require the Secretary to consider fully for listing those species that States or foreign countries have designated or identified as in need of protection. This requirement applies regardless of the distribution of such species.

The proposed amendments would streamline the listing process by reducing the time periods for rulemaking, consolidating public meeting and hearing requirements, and requiring only if practical, publication of proposed regulations in local newspapers. The proposed amendments would require the Secretary to allow the public a minimum 60-day comment period on a proposed regulation and an opportunity to request within 45 days after the date of the general notice of proposed rulemaking, a public hearing on the action. If requested, the Secretary must promptly conduct a public hearing on the action. The public hearing should be conducted in a timely manner to allow for meaningful consideration of all information gleaned during the hearing before publication of the final determination. The Secretary shall determine the procedures necessary for such hearing.

As part of the public comment process, the Secretary would be required to provide to the State agency responsible for the conservation of fish or wildlife or plants in each State in which the species is believed to occur actual notice of any proposed regulation concerning the listing of such species. He would also be required to invite the comment of that agency on the proposed regulation. The involvement and advice of such State agencies in the Federal regulatory process is crucial and must not be ignored.

The proposed amendment to the petition process (section 4(a)(3) of S. 2309) alter the evidentiary standard petitioners must satisfy to warrant a status review of the species proposed for listing or delisting. The Act previously required the Secretary to determine whether a petitioner had presented substantial evidence justifying a status review. Concern was expressed at the hearings that, particularly with respect to the economic considerations required for critical habitat designations, petitioners may be required to present economic information relevant to the proposed action. The amendments make clear that petitioners would be required to present only biological, not economic information.