Kristen Monsell (*Pro hac vice*)
Emily Jeffers (*Pro hac vice*)
Center for Biological Diversity
1212 Broadway, Ste. 800
Oakland, CA 94612
Phone: 510-844-7137
Fax: (510) 844-7150
Email: kmonsell@biologicaldiversity.org
ejeffers@biologicaldiversity.org

*Attorneys for Intervenor-Defendant*
*Center for Biological Diversity*

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| STATE OF ALASKA,<br><br>        *Plaintiff*,<br>    v.<br><br>NATIONAL MARINE FISHERIES SERVICE,<br><br>        *Defendant*,<br><br>    and<br><br>CENTER FOR BIOLOGICAL DIVERSITY,<br><br>        *Intervenor-Defendant.* | Civil Action No. 3:23-cv-00032-SLG |

## INTERVENOR-DEFENDANT'S OPPOSITION
## TO PLAINTIFF'S OPENING BRIEF UNDER LOCAL RULE 16.3(c)(1)

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................. ii

INTRODUCTION ............................................................................................... 1

BACKGROUND .................................................................................................. 2

    I.     The ESA Requires Critical Habitat Designations for Listed
           Species.............................................................................................. 2

    II.    The Bearded and Ringed Seal ESA-Listings ................................. 5

    III.   The Statutorily Mandated Critical Habitat Designations ............... 9

STANDARD OF REVIEW .................................................................................. 13

ARGUMENT........................................................................................................ 14

    I.     The Critical Habitat Designations are Consistent with the
           ESA's Plain Language and Implementing Regulations............................. 14

         A.    The Habitat Requirements of Bearded and Ringed Seals
               Are Extensive and Dynamic............................................. 14

         B.    The Designations Contain Features Essential to the
               Species' Conservation ...................................................... 18

    II.    The Designations Are Specific and Based on the Best Available
           Science............................................................................................ 23

    III.   The Designations Sufficiently Identify Special Management
           Considerations................................................................................ 29

    IV.   The Critical Habitat Designations are Prudent............................ 32

    V.    NMFS's Economic Analysis Satisfies the ESA's Requirements................ 38

CONCLUSION .................................................................................................... 40

CERTIFICATE OF COMPLIANCE WITH WORD LIMIT ............................. 42

# TABLE OF AUTHORITIES

**Cases**

*Alaska Oil & Gas Ass'n v. Pritzker,*
840 F.3d 671 (9th Cir. 2016).....................................................................passim

*Alaska Oil & Gas Ass'n v. Ross,*
722 Fed.App'x 668 (9th Cir. 2018).........................................................9, 38

*Alaska Oil & Gas Ass'n v. Salazar,*
916 F.Supp.2d 974 (D. Alaska 2013) ....................................................34, 35

*Alaska Oil and Gas Ass'n v. Jewell,*
815 F.3d 544 (9th Cir. 2016)....................................................................passim

*Ariz. Cattle Growers' Ass'n v. Kempthorne,*
606 F.3d 1160 (9th Cir. 2010).........................................................15, 26, 28

*Ariz. Cattle Growers' Ass'n v. Kempthorne,*
534 F.Supp.2d 1013, 1031 (D. Ariz. 2008), ...........................................29, 31

*Bear Valley Mut. Water Co. v. Salazar*, No. 11-01263-JVS (ANx),
2012 WL 5353353 (C.D. Cal. Oct. 17, 2012) .................................................31

*Bennett v. Spear*,
520 U.S. 154 (1997) ........................................................................................34

*Cape Hatteras Access Pres. All. v. U.S. Dept. of Interior,*
344 F.Supp.2d 108 (D.D.C. 2004)...............................................25, 26, 31

*Ctr. for Biological Diversity v. Norton*,
240 F.Supp.2d 1090 (D. Ariz. 2003).................................................................3

*Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*,
450 F.3d 930 (9th Cir. 2006)....................................................................4, 34

*Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*,
67 F.4th 1027 (9th Cir. 2023) .................................................................20, 21

*Forest Guardians v. Babbitt,*
174 F.3d 1178 (10th Cir. 1998) ................................... 36

*Gifford Pinchot Task Force v. U.S. Fish & Wildlife Serv.,*
378 F.3d 1059 (9th Cir. 2004) ..................................... 4

*Home Builders Ass'n of N. Cal. v. U.S. Fish & Wildlife Serv.,*
616 F.3d 983 (9th Cir. 2010) ...................................... 25

*Home Builders Ass'n of N. Cal. v. U.S. Fish & Wildlife Serv.,*
268 F.Supp.2d 1197 (E.D. Cal. 2003) ....................... 25, 31

*Middle Rio Grande Conversancy Dist. v. Babbit,*
206 F.Supp.2d 1156 (D.N.M. 2000) ......................... 21, 36

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,*
463 U.S. 29 (1983) .................................................... 13, 14

*N. Spotted Owl v. Lujan,*
758 F.Supp. 621 (W.D. Wash. 1991) .............................. 3

*Nat. Res. Def. Council v. U.S. Dep't of Interior,*
113 F.3d 1121 (9th Cir. 1997) ............................ 32, 34, 35

*Salinas v. U.S. Rail Ret. Bd.,*
141 S.Ct. 691 (2021) ................................................... 37

*San Luis & Delta-Mendota Water Auth. v. Jewell,*
747 F.3d 581 (9th Cir. 2014) ...................................... 27

*Sw. Ctr. for Biological Diversity v. Babbitt,*
215 F.3d 58 (D.C. Cir. 2000) ...................................... 26

*Tenn. Valley Auth. v. Hill,*
437 U.S. 153 (1978) ..................................................... 2

*Weyerhaeuser v. U.S. Fish & Wildlife Serv.,*
139 S.Ct. 361 (2018) ..................................... 36, 37, 39, 40

Case 3:23-cv-00032-SLG   Document 30   Filed 12/14/23   Page 4 of 48

**Statutes**

5 U.S.C. § 706(2)(A) .................................................................................... 13

16 U.S.C. §§ 1401-02 ................................................................................... 15

16 U.S.C. § 1531(b) .................................................................................... 2, 4

16 U.S.C. § 1532(3) ................................................................................... 4, 32

16 U.S.C. § 1532(5)(A)(i) .......................................................................... 3, 29

16 U.S.C. § 1533(a)(3)(A) ............................................................................. 32

16 U.S.C. § 1533(a)(3)(A)(i) ........................................................... 4, 9, 33, 37

16 U.S.C. § 1533(b)(1)(A) .............................................................................. 2

16 U.S.C. § 1533(b)(2) ........................................................................... passim

16 U.S.C. § 1533(b)(6)(C) .............................................................................. 4

16 U.S.C. § 1533(b)(6)(C)(ii) ..................................................................... 4, 33

**Regulations**

50 C.F.R. § 424.02 .................................................................................. 3, 24, 29

50 C.F.R. § 424.12(a) ............................................................................... 34, 35

50 C.F.R. § 424.12(a)(1)(i) ............................................................................. 4

50 C.F.R. § 424.12(b)(1)(ii) .......................................................................... 24

50 C.F.R. § 424.12(b)(1)(iv) .......................................................................... 29

50 C.F.R. § 424.12(g) .................................................................................. 22

50 C.F.R. § 424.19(b) .................................................................................. 40

**Other Authorities**

75 Fed. Reg. 65,239 (Oct. 22, 2010) ....................................................................... 5

84 Fed. Reg. 45,020 (Aug. 27, 2019) ........................................................... 35, 36

H.R. Rep. No. 94-887 (1976) .................................................................................. 3

# INTRODUCTION

This case involves critical habitat protections for the Arctic ringed seal ("ringed seal") and Beringia distinct population segment of the bearded seal ("bearded seal"). Both species need ample sea ice to survive. It is the only surface where they breed, give birth, raise their young, and haul out to complete their annual molt. Ringed seals also need deep snow on top of sea ice to build caves that provide newborn and nursing pups with vital safeguards from the cold and predators.

After finding the seals in danger of extinction within the foreseeable future because climate change will destroy the sea ice (and snow) the seals need to survive, the National Marine Fisheries Service ("NMFS") listed both species as threatened under the Endangered Species Act ("ESA") in 2012—decisions the Ninth Circuit Court of Appeals upheld after challenged by Plaintiff and others. The listing of the seals triggered the agency's mandatory duty to designate critical habitat for both species based on the best available science. That is precisely what NMFS did. After an exhaustive review of the science, NMFS designated the habitat areas that contain the features essential to the conservation of the seals and that may require special management.

Plaintiff takes advantage of the seals' life history characteristics—their large ranges and unpredictable movements—to assert that the designations are not specific enough. But, as the Ninth Circuit has repeatedly affirmed, the ESA does not require such an impossible level of specificity. None of Plaintiff's other demands are required by the

ESA either. At bottom, Plaintiff's complaints boil down to disagreements with climate science and NMFS's ultimate critical habitat decisions, on which this Court must defer to the agency.

Indeed, many of Plaintiff's arguments mirror those made in unsuccessful challenges to the critical habitat designation for the polar bear. Like the polar bear, the habitat needs of these seals—and consequently their designated critical habitats—may indeed be vast, but this is by no means grounds for depriving the species of legally mandated protections.

## BACKGROUND

## I. THE ESA REQUIRES CRITICAL HABITAT DESIGNATIONS FOR LISTED SPECIES

The ESA represents "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 180 (1978). The ESA's purposes are "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved" and "to provide a program for the conservation of such … species." 16 U.S.C. § 1531(b).

To that end, Section 4 of the ESA requires the Secretary of Commerce, through NMFS, to list species it determines are endangered or threatened "solely on the basis of the best scientific and commercial data available." *Id.* § 1533(b)(1)(A). It also requires NMFS to timely designate critical habitat for listed species "on the basis of the best scientific data available" after considering the economic, national security, and other

relevant impacts. *Id.* § 1533(b)(2); *Alaska Oil and Gas Ass'n v. Jewell*, 815 F.3d 544, 551 (9th Cir. 2016) [hereinafter *Jewell*].

The ESA defines critical habitat, in pertinent part, as "specific areas within the geographical area occupied by the species … on which are found those physical or biological features (I) essential to the conservation of the species and (II) which may require special management considerations or protection." 16 U.S.C. § 1532(5)(A)(i); *see also* 50 C.F.R. § 424.02 (defining "physical or biological features" as "features that occur in specific areas and that are essential to support the life-history needs of the species").

Legislative history shows that Congress saw critical habitat as perhaps the most important element of the ESA:

> [C]lassifying a species as endangered or threatened is only the first step in insuring its survival. *Of equal or more importance is the determination of the habitat necessary for the species' continued existence.* Once a habitat is so designated, the Act requires that proposed Federal actions not adversely affect the habitat. If the protection of endangered and threatened species depends in large measure on the preservation of the species' habitat, then *the ultimate effectiveness of the Endangered Species Act will depend on the designation of critical habitats.*

*Ctr. for Biological Diversity v. Norton*, 240 F.Supp.2d 1090, 1098 (D. Ariz. 2003) (quoting H.R. Rep. No. 94-887, at 3 (1976)). Critical habitat designations for listed species are therefore recognized as "a central component of the legal scheme developed by Congress to prevent the permanent loss of species." *N. Spotted Owl v. Lujan*, 758 F.Supp. 621, 629 (W.D. Wash. 1991); *see also Jewell*, 815 F.3d at 550-51 ("The purpose of the ESA is to ensure the recovery of endangered and threatened species, not merely the

survival of their existing numbers." (citing 16 U.S.C. §§ 1531(b), 1532(3)); *Gifford Pinchot Task Force v. U.S. Fish & Wildlife Serv.*, 378 F.3d 1059, 1070 (9th Cir. 2004) ("[T]he purpose of establishing 'critical habitat' is for the government to carve out territory that is not only necessary for the species' survival but also essential for the species' recovery."), *amended on other grounds*, 387 F.3d 968 (9th Cir. 2004).

The ESA requires critical habitat generally be designated concurrently with the listing of species. 16 U.S.C. § 1533(a)(3)(A)(i), (b)(6)(C). If such habitat is "not then determinable," the ESA allows a delay in designation of "not more than one additional year." *Id.* § 1533(b)(6)(C)(ii). Further delays are not allowed. By the end of the additional year, NMFS "*must* publish a final [critical habitat rule], *based on such data as may be available at that time*, designating, to the maximum extent prudent, such habitat." *Id.* § 1533(b)(6)(C)(ii) (emphasis added); *see also Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*, 450 F.3d 930, 935 (9th Cir. 2006) ("[C]ritical habitat designations are mandatory."). NMFS's ESA regulations specify the agency "may, but is not required to, determine that a designation would not be prudent" in limited circumstances, such as where "the species is threatened by taking or other human activity and identification of critical habitat can be expected to increase the degree of such threat." 50 C.F.R. § 424.12(a)(1)(i).

Time has proven the wisdom of Congress's approach in mandating critical habitat designations. Studies have shown, for example, that species with critical habitat are more

than twice as likely to be recovering, and less than half as likely to be declining, than species without it. PUB13917-23.

## II.    THE BEARDED AND RINGED SEAL ESA-LISTINGS

In May 2008, Intervenor-Defendant petitioned NMFS to list three ice-dependent seals under the ESA based on the threat of sea ice loss due to climate change: spotted seals, bearded seals, and ringed seals. *E.g.*, NMFS0045. NMFS listed the southern distinct population segment of spotted seals as threatened in 2010, 75 Fed. Reg. 65,239 (Oct. 22, 2010), and listed both bearded seals and ringed seals as threatened in 2012, NMFS0078-107 (bearded seals); NMFS0044-77 (ringed seals).

In doing so, NMFS found the principal threat to the seals "is habitat alteration stemming from climate change." NMFS0046; NMFS0080. This is because, as NMFS explained, sea ice is the only surface where these seals breed, give birth, nurse pups, and haul out to complete their annual molt. NMFS0048-49; NMFS0081-82. It also gives mothers close access to food while nursing and a safe place for pups to learn how to dive and hunt away from predators. NMFS0048-49; NMFS0081-82. Yet sea ice is rapidly declining and projected to continue to do so for the foreseeable future. *See, e.g.*, NMFS0047; NMFS0082-83, NMFS0101.

Bearded seals primarily feed on benthic (*i.e.*, seabed-dwelling) organisms that are more plentiful in shallow waters where light can reach the seafloor. NMFS0023. As such, the bearded seal's range is generally restricted to areas where seasonal sea ice occurs over

relatively shallow waters, typically less than 200 meters deep. NMFS0081; *see also Alaska Oil & Gas Ass'n v. Pritzker*, 840 F.3d 671, 677 (9th Cir. 2016) [hereinafter *Pritzker*] (noting the agency's conclusion that "the availability of sea ice in shallow water was crucial to the [bearded seal's] viability").

And unlike other seals, ringed seals excavate caves in the snow on top of sea ice, forming subnivean lairs, or snow caves. NMFS0048. These snow caves hide seals from predators and provide insulation from the extreme cold while seals are resting, which is especially important in spring, when adult females are whelping and nursing their young. *Id*. Pups are much more likely to freeze to death or be eaten by predators without snow caves; indeed, studies have documented a *nearly 100 percent* pup mortality rate without them. *Id.* (citing studies).

"Snow drifts to 45 [centimeters] or more are needed for excavation and maintenance of simple lairs, and birth lairs require depths of 50 to 65 [centimeters] or more." NMFS0049 (citing studies). Such drifts typically only occur on flat ice where average snow depths are at least 20-30 centimeters and "drifting has taken place along pressure ridges or ice hummocks." *Id*. (citing studies). Areas with less than 20 centimeters average snow depth in April are inadequate for the formation of ringed seal birth lairs. *Id.* Sea ice is essential to the formation of snow caves—the loss of sea ice as a platform to collect snow substantially reduces the amount of snow that can accumulate. NMFS0060.

In listing both species, NMFS relied on models widely accepted as the best available science on climate change, using them to analyze impacts from habitat loss through 2100. NMFS0046, NMFS0061-62; NMFS0080, NMFS0092-93. Specifically, NMFS used observational and predictive data from the Intergovernmental Panel on Climate Change ("IPCC") to analyze the extent of Arctic sea ice loss (and snow cover loss in the ringed seal listing) within the foreseeable future, then evaluated related effects of such habitat loss. NMFS0046, NMFS0060, NMFS0061-62; NMFS0092. NMFS explained that, because of the time lag between emissions and climactic changes, model projections to 2050 are "primarily due to emissions that have already occurred and those that will occur over the next decade." NMFS0062; NMFS0092. As such, "conditions projected to mid-century are less sensitive to assumed future emissions scenarios." NMFS0062; NMFS0092.

NMFS explained that while "projections of [greenhouse gas emissions] become increasingly uncertain and subject to assumed emissions scenarios in the latter half of the 21st century, projections of air temperatures *consistently indicate that warming will continue throughout the century.*" NMFS0062 (emphasis added); NMFS0092 (emphasis added). And while "the magnitude of the warming depends somewhat on the assumed emissions scenario, *the trend is clear and unidirectional*," with "relatively little uncertainty that warming will continue." NMFS0062 (emphasis added); NMFS0092 (emphasis added). This warming means "loss of sea ice and reduced snow cover will

continue throughout the 21st century." NMFS0062; NMFS0092. As NMFS explained in its ringed seal listing decision, ten additional climate models also predicted substantial decline in snow cover through 2100, confirming the IPCC's projections. NMFS0060.

Based on these models and other science, NMFS concluded that (1) "the consequences of habitat change associated with a warming climate can be expected to manifest throughout the current breeding and molting ranges" of bearded and ringed seals, and (2) "ongoing and projected changes in sea ice habitat pose significant threats to the persistence of" both species. NMFS0056; NMFS0088. NMFS also concluded that "[w]ithin this century, snow cover is forecasted to be inadequate for the formation and occupation of birth lairs over most of the [ringed seals'] range." NMFS0055; *see also* NMFS0047 (models show that by mid-century there will be inadequate snow cover in April for ringed seals to build and maintain snow caves in large portions of their range). NMFS then determined that such losses would likely cause the extirpation of bearded and ringed seals from most places they live and threaten the species with extinction within the foreseeable future. NMFS0055; NMFS0087. NMFS listed both seals as threatened as a result. NMFS0055; NMFS0087.

Plaintiff and others challenged both listing rules on a variety of grounds, claiming, *inter alia*, that NMFS's decisions were not based on the best available science, that the seals' populations were plentiful, and that the climate science was too uncertain to support the listings. *See Pritzker*, 840 F.3d at 674-75 (bearded seal); *Alaska Oil & Gas*

*Ass'n v. Ross*, 722 Fed.App'x 668 (9th Cir. 2018) [hereinafter *Ross*] (ringed seal). The Ninth Circuit rejected their arguments, declaring, "the IPCC climate models constitute[ ] 'the best available science' and reasonably support[ ] the determination that a species reliant on sea ice likely would become endangered in the foreseeable future." *Pritzker*, 840 F.3d at 679 (citation omitted); *Ross*, 722 Fed.App'x at 668-69 (quoting *Pritzker*).

The Ninth Circuit further held that courts cannot require the agency to "wait until it ha[s] quantitative data reflecting a species' decline … before it could adopt conservation policies to prevent that species' decline." *Prizker*, 840 F.3d at 683; *Ross*, 722 Fed.App'x at 668 (quoting *Pritzker*). As such, "[u]ncertainty regarding the speed and magnitude of" sea ice or snow cover loss "does not invalidate data presented in the administrative record that reasonably supports the conclusion that loss of habitat at key life stages will likely jeopardize the [bearded and ringed seals'] survival over the next 85 years." *Prizker*, 840 F.3d at 683; *Ross*, 722 Fed.App'x at 668 (quoting *Pritzker*).

## III.   THE STATUTORILY MANDATED CRITICAL HABITAT DESIGNATIONS

The ESA listings of bearded and ringed seals triggered NMFS's mandatory duty to designate critical habitat for both species based on the best available science. 16 U.S.C. § 1533(a)(3)(A)(i), (b)(2). NMFS did not designate critical habitat at the time of these listings but instead invoked a one-year extension and solicited public comments to help inform the designations. *See* NMFS0045; NMFS0079.

Following litigation challenging NMFS's prolonged failure to designate critical habitat for either species, NMFS issued separate proposed critical habitat designations in January 2021.[1] NMFS held three public hearings and invited public comments on the proposed designations and the accompanying Draft Impact Analysis Reports (analyzing the costs and benefits of the proposed designations) until April 2021. NMFS4225; NMFS4279.

NMFS also submitted the proposed designations for peer reviews. NMFS4225; NMFS4279. The "peer reviewers generally agreed that [NMFS] relied on the best available data regarding the habitat requirements of [bearded and ringed seals] and generally concurred with [NMFS's] application of this information in determining specific areas that meet the definition of critical habitat." NMFS4225; NMFS4279.

NMFS finalized the designations in April 2022. In doing so, NMFS explained how it examined "the best scientific information available regarding the natural history of" bearded and ringed seals "and the habitat features that are essential to support the species' life-history needs," identifying three "physical and biological features … essential to the [seals'] conservation … within U.S. waters occupied by the species." NMFS4213; NMFS4264. For bearded seals they are:

---

[1] This followed a proposed ringed seal critical habitat designation NMFS issued in December 2014 that it did not finalize given a 2016 district court decision vacating the listing of the ringed seal, which the Ninth Circuit overturned in 2018. NMFS4260 (citing *Ross*). NMFS's 2021 proposal updated the 2014 proposed designation based on new science. NMFS4260.

(1) *Sea ice habitat suitable for whelping and nursing, which is defined as areas with waters 200 [meters] or less in depth containing pack ice of at least 25 percent concentration and providing bearded seals access to those waters from the ice.…*

(2) *Sea ice habitat suitable as a platform for molting, which is defined as areas with waters 200 [meters] or less in depth containing pack ice of at least 15 percent concentration and providing bearded seals access to those waters from the ice.…*

(3) *Primary prey resources to support bearded seals: Waters 200 [meters] or less in depth containing benthic organisms, including epifaunal and infaunal invertebrates, and demersal fishes.*

NMFS4213, NMFS4214.

For ringed seals they are:

(1) *Snow-covered sea ice habitat suitable for the formation and maintenance of subnivean birth lairs used for sheltering pups during whelping and nursing, which is defined as waters 3 [meters] or more in depth (relative to [mean lower low water]) containing areas of seasonal landfast (shorefast) ice or dense, stable pack ice, that have undergone deformation and contain snowdrifts of sufficient depth to form and maintain birth lairs (typically at least 54 [centimeters] deep).…*

(2) *Sea ice habitat suitable as a platform for basking and molting, which is defined as areas containing sea ice of 15 percent or more concentration in waters 3 [meters] or more in depth (relative to [mean lower low water]).…*

(3) *Primary prey resources to support Arctic ringed seals, which are defined to be small, often schooling, fishes, in particular Arctic cod, saffron cod, and rainbow smelt; and small crustaceans, in particular, shrimps and amphipods.*

NMFS4264, NMFS4265, NMFS4266.

Both designations include a "subset" of areas occupied by the species in the

Bering, Beaufort, and Chukchi Seas in U.S. waters. NMFS4234-35; NMFS4289. Both

designations exclude large areas of the Beaufort Sea, including nearly half of the ringed seal's northernmost habitat in the Beaufort Sea. *See* NMFS4259; NMFS4315.[2] The specific boundaries of the critical habitat designations for each species differs, reflecting the differences in where the essential habitat features for each species are found. *See, e.g.*, NMFS4215-18 (describing how NMFS determined the boundaries for bearded seal critical habitat); NMFS4267-69 (describing how NMFS determined the boundaries for ringed seal critical habitat).

NMFS explained how "[t]he seasonality of ice cover strongly influences Arctic ringed seal movements, foraging, reproductive behavior, and vulnerability to predation," NMFS4261, and, likewise, "[b]earded seal movements and habitat use are strongly influenced by the seasonality of sea ice," with "many seals migrat[ing] seasonally to maintain access to [drifting sea] ice," NMFS4215. NMFS further explained that the designations were as specific as the best available science allows given the dynamic and variable nature of the sea ice essential features on both a spatial and temporal scale. NMFS4215; NMFS4267; *see also* NMFS4235 ("In making decisions about the appropriate scale and boundaries for the specific areas … [NMFS] considered, among other factors, the life history of the species and the scales at which data are available to inform [its] analysis.").

---

[2] Intervenor-Defendant requested that NMFS include more occupied U.S. habitat than was designated. *See* PUB14317; PUB14603-04.

NMFS then identified the threats that imperil each essential critical habitat feature and how they may require special management considerations or protections as a result. NMFS4218-20; NMFS4269-72. The agency also explained the economic costs of the designations, and the numerous benefits of the designations to each species. For example, NMFS noted "the primary benefit" of the designations is that all federal agencies will now be required to consult with NMFS to ensure their actions do not adversely modify or destroy the protected habitat. NMFS4222; NMFS4273. The agency also described several other benefits, "including education and enhanced public awareness, which may help focus and contribute to conservation efforts" for the seals and their habitat. NMFS4222; NMFS4273. The agency detailed these costs and benefits in its Final Impact Analysis Reports. NMFS3931-40; NMFS4083-92.

## STANDARD OF REVIEW

The Administrative Procedure Act governs the standard and scope of judicial review of a critical habitat designation. *See Jewell*, 815 F.3d at 554. In reviewing an agency decision under the Administrative Procedure Act, courts must determine whether that decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* (quoting 5 U.S.C. § 706(2)(A) (additional citation omitted)).

In applying this standard, "a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Rather, the court examines whether the agency considered the relevant factors,

"articulate[d] … a rational connection between the facts found and the choice made, … and whether there was a clear error of judgment." *Id.* (cleaned up) (citations omitted). A court should "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Id*. (citations omitted).

## ARGUMENT

## I.  THE CRITICAL HABITAT DESIGNATIONS ARE CONSISTENT WITH THE ESA'S PLAIN LANGUAGE AND IMPLEMENTING REGULATIONS

Plaintiff makes much of the size of the critical habitat designations, claiming their large size deprives the words "essential" and "specific" in the ESA's definition of critical habitat of meaning. Pl.'s Opening Br. 21, ECF No. 17 ("Pl.'s Br."). Plaintiff is wrong on both accounts, and its argument is based on a fundamental misunderstanding of the relevant facts and law. NMFS based its critical habitat designation on the best available science, which is precisely what the ESA requires. Plaintiff's demands for greater specificity contradict the ESA's plain language and Ninth Circuit precedent.

### A.  The Habitat Requirements of Bearded and Ringed Seals Are Extensive and Dynamic

As NMFS explained in detail in the final listing decisions and critical habitat designations, bearded and ringed seals are wide-ranging species. And while their ranges are large, all areas in the respective critical habitat designations are regularly used by the seals and are essential to their survival. *See Ariz. Cattle Growers' Ass'n v. Kempthorne*,

606 F.3d 1160, 1165 (9th Cir. 2010) (Habitat is "occupied" for critical habitat purposes if it is "regularly used by the species.").

The Marine Mammal Commission[3] emphasized these points in its support of the ringed seal critical habitat designation:

> Although the area being proposed by NMFS as critical habitat for ringed seals is large because of the occurrence of ringed seals throughout this area, the dependence of ringed seals on specific snow and sea ice conditions, the large inter-annual variation in the distribution of different snow and sea ice habitat types, and the large areas that individual ringed seals may use in a given year, the entire area proposed constitutes important habitat that is essential for the conservation of Arctic ringed seals—that is, protection of the entire area is necessary to prevent the ringed seals that occur in the United States from becoming endangered and to bring them to the point where the protections afforded by the [ESA] are no longer necessary.

PUB0288; *see also* PUB14519-20 (similar comments on proposed bearded seal critical habitat designation).

The primary reason for the bearded and ringed seals' wide-ranging habitat needs is because the sea-ice environment in which the seals spend their time and engage in their essential behaviors is extremely dynamic. The seals must move across vast expanses throughout the year to adjust to the constantly changing distribution of sea ice. Studies have demonstrated, for example, that individual ringed seals have traveled up to 6,140 kilometers (or 3,815 miles) during the open-water season. NMFS4263.

---

[3] Congress established the Marine Mammal Commission to make recommendations to NMFS on matters related to marine mammals. 16 U.S.C. §§ 1401-02.

The Bering-Chukchi shelf comprises the largest area of continuous habitat for bearded seals. NMFS4211. "Bearded seals can reach the bottom everywhere along the shallow shelf, so it provides them favorable foraging habitat." *Id*. (citing study). As the ice forms in the fall and winter, many bearded seals move south with the advancing ice edge through the Bering Strait into the Bering Sea where they spend the winter. *Id*. During the winter and spring, pregnant females find broken pack ice over shallow areas on which to give birth, then hunt, nurse pups, and molt from this ice. *Id*. In the spring, as the ice begins to melt, many of the seals that wintered in the Bering Sea migrate north through the Bering Strait and into the Chukchi and Beaufort Seas, following the sea-ice edge to spend the summer and early fall foraging in these waters. *Id*.

Ringed seals use nearly the entire ice field over the Bering Sea during winter and spring, when they are also found throughout the Chukchi and Beaufort Seas. NMFS4262. Ringed seals build snow caves on landfast ice and stable pack ice where snow depth is sufficient. NMFS4261-62. The snow is typically deep enough only where the ice has undergone a certain amount of deformation and where the snow has drifted into ice hummocks or pressure ridges. NMFS4262. During this time (the "subnivean period"), ringed seals rest, give birth, and nurse pups in these caves. *Id.* The number of ringed seals hauled out on the ice's surface usually increases during the spring as temperatures warm and the snow covering the seals' caves melts. *Id.* Ringed seals complete their annual molt on this ice during the spring (the "basking period"). *Id.* In spring, most ringed seals that

winter in the Bering and southern Chukchi Seas migrate northward as the ice edge recedes, spending their summer open-water period in the pack ice of the northern Chukchi and Beaufort Seas. NMFS4263. During this time (the "open-water period"), ringed seals feed intensively to replenish their blubber supplies lost during from late winter to early summer. *Id.*

The Marine Mammal Commission noted the challenges of designating critical habitat given the dynamic nature of this habitat:

> Throughout their range, seals can move extensively and use different types of habitat for different functions at different times of the year. The sea ice habitat suitable for the formation and maintenance of subnivean lairs used to shelter mothers and pups during whelping and nursing as well as the sea ice habitat needed by ringed seals for molting and basking (two of the three primary constituent elements identified for Arctic ringed seal critical habitat in the proposed rule) is highly dynamic and varies considerably within and among seasons and between years. Thus one cannot identify a less extensive, specific geographic location for breeding or molting that will reliably support these functions year after year than has been identified in the proposed rule. A similar challenge exists for identifying specific areas of particular importance for foraging as seals feed throughout their range, year-round.

PUB0287. Against this backdrop, NMFS's critical habitat designations were appropriate, necessary, and lawful. *See Jewell*, 815 F.3d at 599 (upholding polar bear critical habitat designation, where the record "established that polar bears are highly mobile and spend most of their time on sea ice," and "it is difficult (if not impossible) to predict precisely where [polar bears] will move within denning habitat in the future").

## B. The Designations Contain Features Essential to the Species' Conservation

The designations are consistent with the ESA's plain language as they contain the features that are "essential"—i.e., "necessary" or "more than convenient or helpful"—to the conservation of bearded and ringed seals. *Contra* Pl.'s Br. 21 (citations omitted). Bearded and ringed seals cannot survive without ice: they depend on sea ice for pupping, nursing, molting, and resting. NMFS0048; NMFS0081-82. Bearded seals also need ice over relatively shallow waters to access their preferred prey. NMFS0081; NMFS4211, NMFS4214-15; *see also Pritzker*, 840 F.3d at 681 ("NMFS reasonably concluded that there would be continued sea ice loss over shallow waters, resulting in habitat loss that would almost certainly threaten the [bearded seal's] survival."). And ringed seals also need a sufficient amount of snow on top of the sea ice at a particular time of year to build snow caves. NMFS0049; NMFS4264.

NMFS designated a subset of the seals' sea ice habitat as critical habitat and explained how the best available science shows that each of the designated areas contain features essential to the seals' conservation. In issuing the designation for ringed seals, NMFS explained that "[s]now-covered sea ice habitat suitable for the formation and maintenance of subnivean birth lairs used for sheltering pups during whelping and nursing is essential to conservation of the Arctic ringed seal because without the protection of lairs, ringed seal pups are more vulnerable to freezing and predation." NMFS4264. NMFS based this explanation on scientific information demonstrating that,

Case 3:23-cv-00032-SLG   Document 30   Filed 12/14/23   Page 24 of 48

*inter alia*, "[w]hen snow depth is insufficient, pups can freeze in their lairs," and "when lack of snow cover has forced birthing to occur in the open, nearly 100 percent of pups died from predation." NMFS4285-86.

NMFS also explained why "[s]ea ice habitat suitable as a platform for basking and molting is essential to conservation of the Arctic ringed seal," namely "because molting is a biologically-important, energy-intensive process that could incur increased energetic costs if it were to occur in water, or increased risk of predation if it were to occur on land." NMFS4265. NMFS further explained it was "unaware of any studies establishing whether Arctic ringed seals can molt successfully in water, or reports of healthy Arctic ringed seals hauled out on land during the molt." *Id.*

Additionally, NMFS described how access to "[p]rimary prey resources are essential to conservation of the Arctic ringed seal because the seals likely rely on these prey resources the most to meet their annual energy budgets." NMFS4266. NMFS similarly explained why each of the identified features of bearded seal critical habitat are necessary for the species' conservation. NMFS4213-15.

That the designations encompass large areas does not mean they are not "essential." *Contra* Pl's. Br. 21-22. Rather, as NMFS explained, because the bearded and ringed seal's essential habitat features "are not static, and their location changes both seasonally and annually, [the] critical habitat designation[s] must be large enough to account for such changes in the locations of essential features and the particular species'

habitat requirements throughout their life history." NMFS4235; NMFS4290. Accordingly, the agency identified the "specific area that comprises parts of the Bering, Chukchi, and Beaufort seas as critical habitat, within which all of the identified essential features can be found in any given year." NMFS4215; NMFS4267.

In support of its argument, Plaintiff relies on inapposite cases involving *unoccupied* critical habitat. As the Ninth Circuit has explained, "[w]hile the ESA requires that both occupied and unoccupied areas be 'essential' to conservation before they can be designated as critical habitat, … the standard for designating unoccupied critical habitat is 'more demanding' than the standard for designating occupied critical habitat." *Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*, 67 F.4th 1027, 1035 (9th Cir. 2023) (citation omitted). This is because, when the agency made the designations at issue in those cases, the relevant ESA regulations specified that the agency could designate unoccupied critical habitat "*only when a designation limited to [a species'] present range would be inadequate to ensure the conservation of the species.*" *Id.* at 1035-36 (emphasis added) (citation omitted); *see also id.* at 1047 ("The designation of unoccupied critical habitat is governed by a different and *more stringent* standard" than occupied critical habitat. (citations omitted)). Here, the best available science demonstrates bearded and ringed seals occupy their respective critical habitat areas, and Plaintiff does not contest otherwise.

*Center for Biological Diversity v. U.S. Fish and Wildlife Service* is distinct in other significant ways. There, the Ninth Circuit based the part of its decision on which Plaintiff relies (regarding the designation of Subunit 4b of jaguar critical habitat), Pl.'s Br. 22-23, on the fact that the Fish and Wildlife Service ("FWS") "designated a separate corridor that provides the same connectivity function as Subunit 4b" as well as "the complete absence of evidence that jaguars have ever used Subunit 4b" as a migratory corridor "*or for any other purpose*." *Ctr. for Biological Diversity*, 67 F.4th at 1046. Here, the record is replete with evidence that bearded and ringed seals cannot perform their essential life functions in other areas, and that they use the designated areas for the precise purposes for which they were designated: whelping and nursing pups, molting, and as a platform from which to hunt. *See supra* pp. 5-7, 9-13, 18-19.

Nor is *Middle Rio Grande Conversancy District v. Babbit*, 206 F.Supp.2d 1156 (D.N.M. 2000), Pl.'s Br. 23, on point. In that case, the court held FWS's identification of essential habitat features, which FWS described as "water of sufficient quality [and] quantity," was insufficient because such findings were "vague generalities that state little more than what is required for any fish species." *Middle Rio Grande*, 206 F.Supp.2d at 1184-85 (citation omitted). Here, in contrast, NMFS did not just simply identify "sea ice of sufficient quantity" as an essential habitat feature. Rather, the agency specified the particular characteristics of the sea ice and snow cover necessary to support specific life functions. *See, e.g.*, NMFS4265 (defining sea ice habitat for ringed seal molting "*as*

*areas containing sea ice of 15 percent or more concentration in waters 3 [meters] or more in depth (relative to [mean lower low water])*"); NMFS4213 (defining sea ice habitat for bearded seal whelping and nursing "*as areas with waters 200 m or less in depth containing pack ice of at least 25 percent concentration and providing bearded seals access to those waters from the ice*"); *supra* p. 11 (other specific definitions).

Plaintiff's reliance on legislative history commenting on a critical habitat designation for the grizzly bear, Pl.'s Br. 10, 22, likewise fails. In designating the critical habitats at issue here, NMFS did not conclude the designations would be "just beneficial or helpful" to the seals. *Contra id.* (citation omitted). Rather, NMFS explained how and why the designated areas contain the features essential to the seals' conservation.

Plaintiff is also incorrect in arguing that the designated habitat cannot be essential because the seals exist outside the designated areas. *See* Pl.'s Br. 25-26. That the seals occupy areas outside the critical habitat boundaries does not mean the designated areas are unnecessary to their continued existence. NMFS thoroughly described why they are necessary. NMFS also explained that it cannot designate critical habitat outside U.S. jurisdiction. NMFS4209 (citing 50 C.F.R. § 424.12(g)); NMFS4260 (same). Given that NMFS does not designate critical habitat outside U.S. jurisdiction, protecting the seals' critical habitat areas within the United States is all the more essential.

## II.     THE DESIGNATIONS ARE SPECIFIC AND BASED ON THE BEST AVAILABLE SCIENCE

Plaintiff also incorrectly claims the designations run afoul of the ESA's requirement to identify the "specific areas" necessary for the seals' conservation. *See* Pl.'s Br. 18-20. However, Plaintiff "cannot point to evidence that [NMFS] failed to consider, or demonstrate that [NMFS's] stated reasons are irrational or unsupported by the record." *Jewell*, 815 F.3d at 562. Instead, Plaintiff again points to the overall size of the designation, "disagree[ing] with the scope of [NMFS's] designation of critical habitat." *Id.* This is insufficient to overturn NMFS's decision, which "drew rational conclusions from the best available scientific data" as the ESA requires. *Id.* (citing 16 U.S.C. § 1533(b)(2)).

In issuing both designations, NMFS explained that the specific locations of the seals' essential sea ice habitat "vary from year to year, or even day to day, depending on many factors, including time of year, local weather (*e.g.*, wind speed/direction), and oceanographic conditions." NMFS4215; NMFS4267 (citing studies). Specifically, NMFS explained how the "the duration that sea ice habitat essential for whelping and nursing, or for molting, is present in any given location can vary annually depending on the rate of ice melt and other factors," NMFS4215, and that "[s]nowdrift depths on sea ice are also spatiotemporally variable, as drifting of snow is determined by characteristics of the ice, such as surface topography and weather conditions (*e.g.,* wind speed/direction and snowfall amounts), among other factors," NMFS4267 (citing study).

Because of the "dynamic nature" of this habitat and the "spatial and temporal variations in sea ice cover" (and on-ice snow cover in the case of ringed seals), NMFS could not "map precisely the specific geographic locations where the sea ice essential features occur." NMFS4215; NMFS4267. Moreover, the "temporal overlap" of the seals' essential behaviors, such as the overlap of molting with whelping and nursing, "also makes it impracticable to separately identify specific areas where each of these essential features occur." NMFS4215; NMFS4267. Accordingly, for each designation, NMFS designated "a single specific area that contains all three of the identified essential features." NMFS4218; NMFS4269; *see also* NMFS4290 (NMFS identified the areas "with as much specificity as the best scientific data available allows.").

NMFS's approach is fully consistent with the ESA and its best available science mandate. *See, e.g.*, *Jewell*, 815 F.3d at 556 ("The [ESA] contemplates the inclusion of areas that contain [elements] essential for occupation by the polar bear, even if there is no available evidence documenting current activity."). It is also fully consistent with the agency's regulations that define the "[g]eographical area occupied by the species" to include "seasonal habitats, and habitats used periodically," and define critical habitat "features" to include "habitat characteristics that support ephemeral or dynamic habitat conditions." 50 C.F.R. § 424.02; *see also id.* § 424.12(b)(1)(ii) (NMFS should "[i]dentify" essential features "at an appropriate level of specificity using the best available scientific data," which "may include consideration of the appropriate quality,

quantity, and spatial and temporal arrangements of such features in the context of the life history, status, and conservation needs of the species.").

Plaintiff's reliance on *Home Builders Association of Northern California v. U.S. Fish and Wildlife Service*, 268 F.Supp.2d 1197 (E.D. Cal. 2003), Pl.'s Br. 28, is misplaced. There, the court held that, in designating critical habitat for a snake, FWS improperly "defer[red] the assessment of where the [species'] essential habitat features are found until consultation" under ESA Section 7. *Home Builders*, 268 F.Supp.2d. at 1216.[4] Here, in contrast, NMFS identified the specified areas where the seals' essential habitat features are found within the designations themselves and explained its process for doing so. *E.g.*, *supra* pp. 10-12, 18-19.

Plaintiff's attempt to analogize this case to *Cape Hatteras Access Preservation Alliance v. U.S. Department of the Interior*, 344 F.Supp.2d 108 (D.D.C. 2004), Pl.'s Br. 28-29, also fails. In that case, the court found FWS's designation of critical habitat for a shorebird appeared based on "the mere hope that" the designated areas will contain essential features, pointing to, *inter alia*, the agency's acknowledgment that it will "continue to explore ways in which to identify areas within mapped critical habitat boundaries that are not considered critical habitat because they do not contain [essential

---

[4] The Ninth Circuit subsequently disagreed with other portions of the district court's decision requiring FWS to first find "when conservation [of a species] will be complete" before designating critical habitat, "because it lacks legal support and is undermined by ESA's text." *Home Builders Ass'n of N. Cal. v. U.S. Fish & Wildlife Serv.*, 616 F.3d 983, 989 (9th Cir. 2010).

features]" and the agency's admission that it "over-designat[ed]" critical habitat. *Cape Hatteras*, 344 F.Supp.2d at 122-23 (citation omitted).

Here, in contrast, NMFS determined that all the designated areas contain essential habitat features. And it did so based on numerous surveys and other scientific evidence demonstrating that bearded and ringed seals use the designated areas for the purposes which NMFS designated them. *See, e.g.*, NMFS4210-12 (describing findings from aerial surveys of bearded seals, satellite tracking data for tagged bearded seals, and passive acoustic monitoring studies of bearded seal calls); NMFS4261 (describing studies "on movements of individual ringed seals tagged in Alaska"); *see also Jewell*, 815 F.3d at 559 (pointing to studies "track[ing] polar bear activity" in upholding FWS's polar bear critical habitat designation). Plaintiff's reliance on *Middle Rio Grande*, Pl. Br. 30-31, fails for similar reasons, given the extensive evidence supporting NMFS's decision here.

Plaintiff's desire for more specific designations for wide-ranging bearded and ringed seals, which use particular areas based on a variety of changing conditions, is likely impossible. *See Ariz. Cattle Growers'*, 606 F.3d at 1164 ("Determining whether a species uses an area with sufficient regularity that it is 'occupied' is a highly contextual and fact-dependent inquiry." (citation omitted)). It is also at odds with the ESA's requirement that NMFS base critical habitat designations on the best *available* science, not science that does not exist. *See Sw. Ctr. for Biological Diversity v. Babbitt*, 215 F.3d 58, 60 (D.C. Cir. 2000) ("Even if the available scientific and commercial data were quite

inconclusive, [the agency] may—indeed must—still rely on it ….” (citation omitted));

*San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 602 (9th Cir. 2014)

(“[W]here the information is not readily available, we cannot insist on perfection: ‘[T]he

“best scientific … data available,”’ does not mean ‘the best scientific data possible.’”

(citation omitted)).

Indeed, the Ninth Circuit has repeatedly rejected challenges to critical habitat

designations based on a plaintiff’s desire for greater specificity. For example, in

upholding the critical habitat designation for the polar bear, the Ninth Circuit held that the

suggestion that “FWS could designate only areas containing actual den sites, as opposed

to designating areas containing habitat suitable for denning” was improper because “such

a narrow construction of critical habitat runs directly counter to the [ESA’s] conservation

purposes.” *Jewell*, 815 F.3d at 555. Accordingly, the court rejected the plaintiffs’

arguments that FWS could only designate denning habitat if the agency first “indentif[ed]

specifically where, within that area, all … elements of the [essential denning habitat

feature] were located.” *Id*. at 557-58. The court also noted that holding otherwise would

ignore “the unassailable fact that bears need room to roam” and record evidence showing

“it is difficult (if not impossible) to predict precisely where they will move within

denning habitat in the future.” *Id.* at 559; *see also id.* at 558 (“To the extent that Plaintiffs

demand greater scientific specificity than available data could provide, Plaintiffs echo the

district court’s error in demanding too high a standard of scientific proof.”).

Additionally, in *Arizona Cattle Growers'*, the Ninth Circuit rejected a similar argument that FWS could only designate as critical habitat the individual trees that spotted owls nest in during a given year, rather than the entire stand or forest the owls need and use. 606 F.3d at 1163-66 ("Limiting the agency to designating habitat only where the owl 'resides' focuses too narrowly on owl survival and ignores the broader purpose of the critical habitat designation."). The court noted that "[w]here data are inconclusive or where habitat is used on a sporadic basis, allowing the FWS to designate as 'occupied' habitat where the species is likely to be found promotes the ESA's conservation goals and comports with the ESA's policy of 'institutionalized caution.'" *Id.* at 1166-67 (citations omitted). The court further explained that a more restricted interpretation "would make little sense as applied to nonterritorial, mobile, or migratory animals … for which it may be impossible to fix a determinate area in which the animal 'resides.'" *Id.* at 1165-66.

Just as FWS did not have to show specific use of the areas around individual polar bear dens or spotted owl nest sites, so too NMFS need not demonstrate such an unrealistic level of specificity in designating bearded and ringed seal critical habitat. As Plaintiff itself admits, courts should uphold critical habitat designations where "the agency provided scientific analysis, technological data, and other evidence relating to how it determined that there were essential features within the designated areas." Pl.'s Br. 31-32 (citation omitted). That is just what NMFS did here.

## III. THE DESIGNATIONS SUFFICIENTLY IDENTIFY SPECIAL MANAGEMENT CONSIDERATIONS

The ESA requires that any occupied critical habitat must contain "physical or biological features (I) essential to the conservation of the species and (II) which may require special management considerations or protection." 16 U.S.C. § 1532(5)(A)(i); *see also* 50 C.F.R. § 424.12(b)(1)(iv). In issuing the bearded and ringed seal critical habitat designations, NMFS considered the threats that could impact the essential habitat features of both species and properly determined that those threats may require special management considerations. In arguing otherwise, Plaintiff misinterprets the ESA's requirements and ignores NMFS's analysis.

First, Plaintiff is mistaken when it suggests that NMFS must identify special management considerations for the designated habitat *areas*, *see* Pl.'s Br. 32-33; instead, NMFS must only identify special management considerations for the essential *features*. As explained in *Arizona Cattle Growers' Association v. Kempthorne*, "[t]he wording of the [ESA] reveals that the phrase: 'which may require special management considerations or protection' solely modifies the words 'physical and biological features'—not the phrase 'specific areas,' which appears earlier in the sentence." 534 F.Supp.2d 1013, 1031 (D. Ariz. 2008), *aff'd*, 606 F.3d 1160 (9th Cir. 2010). Thus, "the statute does not require anything more than a finding that the physical and biological features *themselves*, not the [areas], may require special management." *Id.*; *see also* 50 C.F.R. § 424.02 ("Special management considerations or protection" are "[m]ethods or procedures useful in

*State of Alaska v. Nat'l Marine Fisheries Serv.*,
No. 3:23-cv-00032-SLG                                                          29

protecting the physical or biological features essential to the conservation of listed species.").

NMFS satisfied this requirement here. In issuing both final rules, NMFS acknowledged that critical habitat must "contain[ ] one or more essential physical or biological feature that may require special management considerations or protection." NMFS4218; NMFS4269 (citations omitted). NMFS identified the threats that imperil "sea ice essential features and the primary prey resources essential feature" and how they may require special management considerations or protections. NMFS4218-20; NMFS4269-72. For both critical habitat designations, NMFS identified those threats as climate change; oil and gas activities; marine shipping and transportation; and commercial fisheries. NMFS4218; NMFS4269. NMFS discussed the ways in which those activities threaten the essential features, concluding that as a result of those threats, either one or both of the essential features may need special management consideration now or in the future. *See, e.g.*, NMFS4270 ("[S]pecial management considerations or protection may be necessary, either now or in the future," to protect essential features of ringed seal critical habitat from climate change.); NMFS4218-19 (same for bearded seals).

Second, NMFS is not required, as Plaintiff suggests, to identify the *specific* management considerations that may be needed to protect essential habitat features. *Contra* Pl.'s Br. 33. The ESA requires only that NMFS determine whether the essential habitat features *may* require special management considerations; it does not require

NMFS to identify those considerations with any particularity. *See Arizona Cattle Growers'*, 534 F.Supp.2d. at 1031 ("[A]ny specificity demanded by Plaintiff is simply unwarranted by the statutory language.").

In the case on which Plaintiff primarily relies, Pl.'s Br. 33-34, FWS entirely failed to identify features that may require special management considerations or protections, mentioning the statutory requirement only briefly in response to a comment and "passing over it without analysis of any kind." *Cape Hatteras*, 344 F.Supp.2d at 124 ("Nowhere does [FWS] directly address the crystal clear statutory requirement that [essential features] must be those that may require special management considerations or protection."). The same was true of the agency's issuance of the critical habitat designation at issue in *Home Builders*, on which Plaintiff also relies. *See* Pl.'s Br. 33; *Home Builders*, 268 F.Supp.2d at 1218 ("Nothing in Defendants' arguments point the court to an indication in the Final Rule or Administrative Record that" FWS found the essential features may require special management in issuing the designation).

Here, in contrast, NMFS spent multiple pages not only identifying the essential features that may require special management considerations and protection, but discussing the various threats that imperil those features. *See* NMFS4218-20; NMFS4269-72. The ESA requires no more. *See Bear Valley Mut. Water Co. v. Salazar*, No. 11-01263-JVS (ANx), 2012 WL 5353353, at *25 (C.D. Cal. Oct. 17, 2012) (calling

the determination that essential features may require special management considerations or protections a "minor legal hurdle"), *aff'd*, 790 F.3d 977 (9th Cir. 2015).

## IV.    THE CRITICAL HABITAT DESIGNATIONS ARE PRUDENT

The ESA does not require an explicit "prudency determination" as a prerequisite to making a critical habitat designation, and here, the agency's decision leaves no doubt as to why it thought the designation was prudent given the particular importance of the designated areas to the bearded and ringed seals' survival and recovery. *Contra* Pl.'s Br. 35-39.

Under the ESA, NMFS has a non-discretionary duty to designate critical habitat upon listing a species. 16 U.S.C. § 1533(a)(3)(A). Prudency is necessarily subsumed within any designation of specified critical habitat, as critical habitat is defined as those areas containing the features "essential for the conservation"—i.e., recovery—"of the species." *Id.* § 1532(5)(A); *see also id.* § 1532(3) (defining "conservation"). NMFS is only required to explain the prudency of its decision when it uses the "rare exception" to forgo designating critical habitat, not when it exercises its "statutory obligation" to designate. *See Nat. Res. Def. Council v. U.S. Dep't of Interior*, 113 F.3d 1121, 1126-27 (9th Cir. 1997).

Here, NMFS expressly considered Plaintiff's concerns regarding the propriety of the designation and ultimately disagreed with them. The agency found that none of the reasons offered "fall[ ] within any of the … circumstances identified in [the]

regulations … in which [NMFS] may determine a designation would not be prudent."
NMFS4250 (citing 50 C.F.R. § 424.12(a)(1)); NMFS4307 (same). NMFS explained, for
example, that "areas within U.S. jurisdiction provide more than negligible conservation
value" for the species and that "the threats to the essential features of [the seals'] critical
habitat do not stem solely from causes that cannot be addressed through management
action." NMFS4250; NMFS4307. NMFS clearly set forth its reasons for rejecting
Plaintiff's objections and thoroughly detailed why the designated areas contain features
essential to the species' conservation. Nothing in the ESA required NMFS to do more.

Plaintiff fundamentally misconstrues the ESA and its implementing regulations,
which emphasize the non-discretionary nature of critical habitat designations. The ESA
states, "to the maximum extent prudent and determinable" NMFS "*shall*, concurrently
with [listing a species] … designate any habitat of such species which is then considered
to be critical habitat." 16 U.S.C. § 1533(a)(3)(A)(i) (emphasis added). It further states
that "[a] final regulation designating critical habitat … *shall* be published concurrently
with the final [rule listing a species], unless [NMFS] deems that … critical habitat of such
species is not then determinable." *Id.* § 1533(b)(6)(C)(ii) (emphasis added). If it is
indeterminable at listing, NMFS can invoke a one-year extension, but by the close of that
additional year, it "*must* publish a final regulation based on such data as may be available
at that time, designating, to the maximum extent prudent, such habitat." *Id.* (emphasis
added). Congress's use of "shall" demonstrates its intent to make designating critical

habitat mandatory. *Bennett v. Spear*, 520 U.S. 154, 172 (1997) ("[T]he terms [for critical habitat designations] are plainly those of obligation rather than discretion.").

Implementing regulations echo the statutory language and its mandatory nature. 50 C.F.R. § 424.12(a). The regulations further specify the limited circumstances under which NMFS may find a designation is not prudent. *Id*. § 424.12(a)(1) (NMFS "may, but is not required to, determine that a designation would not be prudent in the following circumstances," such as when the designation might increase threats to the species).

In keeping with the ESA's mandate, the Ninth Circuit has consistently held critical habitat designation is mandatory. *See, e.g.*, *Jewell*, 815 F.3d at 555 (Listing the polar bear meant FWS "*was required to designate* … critical habitat.") (emphasis added); *Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*, 450 F.3d at 935 ("Critical habitat designations are mandatory" and "must be made at the time a species is listed."); *Nat. Res. Def. Council*, 113 F.3d at 1126 (FWS "failed to discharge its statutory obligation to designate critical habitat."). Plaintiff does not, and cannot, point to any cases that indicate critical habitat designation hinges upon an explicit prudency finding.

Another judge in this district has expressly dismissed Plaintiff's argument that a critical habitat designation must contain an explicit "prudency finding" analysis. *See Alaska Oil & Gas Ass'n v. Salazar*, 916 F.Supp.2d 974, 996 (D. Alaska 2013), *rev'd on other grounds*, *sub nom. Jewell*, 815 F.3d 544 (9th Cir. 2016). In that case, the plaintiffs argued that FWS "failed to make a prudency finding" before designating polar bear

critical habitat, which the court found "unfounded and unconvincing." *Id*. The court could not "find a requirement in the ESA or in its [implementing] regulations that oblige[d] [FWS] to expressly find, and to so state in the Final Rule, that the designation was prudent from the outset." *Id*. "[P]rudency of a designation is implied," and an agency need only "expressly justify its actions when it finds designation to *not be prudent*." *Id*. Likewise here, prudency was implied by NMFS's designations of critical habitat for the seals and no express prudency determination was required.

Plaintiff points to the circumstances outlined in the ESA's regulations for when NMFS can find a designation imprudent as "relevant factors" for Plaintiff's so-called "prudency determination" requirement. Pl.'s Br. 36. But these circumstances are only relevant in making the discretionary determination that critical habitat designation is *not* prudent. 50 C.F.R. § 424.12(a). Further, because NMFS "may, but is not required to, determine that a designation would not be prudent" when the enumerated circumstances are met, NMFS retains discretion to designate critical habitat even in those limited scenarios. *Id*. In short, these circumstances can only be used to justify "the rare imprudence exception," and have no relevance when NMFS designates critical habitat. *Nat. Res. Def. Council*, 113 F.3d at 1127.

Plaintiff's use of the 2019 amendments to the ESA's implementing regulations, Pl.'s Br. 35, is also misplaced. The section that Plaintiff cites is titled "Comments Regarding *Not* Prudent Determinations." 84 Fed. Reg. 45,020, 45,040 (Aug. 27, 2019)

(emphasis added). In its response to comments, NMFS said it "expect[s] to designate [critical habitat] in most cases" and that "Congress intended for [NMFS] to designate critical habitat except in those rare instances when critical habitat would not be 'beneficial to' or 'in the best interests of' the species." *Id*. at 45,040-41 (citing legislative history). Plaintiff's attempts to confuse the not prudent exception with its so-called prudency determination have no basis in the ESA or its regulations.

Plaintiff misinterprets the only two cases it cites in support of its position. *See* Pl.'s Br. 35-36, 38. *Middle Rio Grande* did not address the prudency of a critical habitat designation. *See* 206 F.Supp.2d. at 1185-87. Instead, the case revolved around whether FWS had provided sufficient evidence showing certain stretches of river merited inclusion as critical habitat. *Id.* Far from supporting the proposition that a "prudency determination" is needed before a critical habitat designation, *Middle Rio Grande* arose from a court ordering FWS to designate critical habitat because the agency ignored its "non-discretionary duty" and "statutorily-imposed mandatory deadline" to do so. *Forest Guardians v. Babbitt*, 174 F.3d 1178, 1186 (10th Cir. 1998); *see also Middle Rio Grande*, 206 F.Supp.2d at 1169 ("The statute compels the designation.") (citing *Forest Guardians* and *Nat. Res. Def. Council*).

Any argument that *Weyerhaeuser v. U.S. Fish and Wildlife Service*, 139 S.Ct. 361 (2018), somehow undermines NMFS's approach, Pl.'s Br. 36, is mistaken. In holding that FWS's decision not to exclude an area from critical habitat is subject to judicial review,

the Supreme Court pointed to the "unified process" mandated by Section 4(b)(2), "which directs [FWS] to consider the economic and other impacts of designation when making [its] exclusion decisions." *Weyerhaeuser*, 139 S.Ct. at 371. The Court emphasized that the statute itself calls for an express analysis of economic impacts when making exclusion decisions. *Id.* In sharp contrast, here, neither the statute nor the regulations mandate a specific prudency analysis in addition to the agency's ultimate finding as to what specific areas contain the features necessary to conserve the species. *See* 16 U.S.C. § 1533(a)(3)(A)(i), (b)(6)(C)(ii). Indeed, the Court's finding only emphasizes that if Congress had intended NMFS to go through an explicit prudency determination process, it would have said so. *See Salinas v. U.S. Rail Ret. Bd.*, 141 S.Ct. 691, 698 (2021) ("Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress act[ed] intentionally and purposely in the disparate" treatment. (citation omitted)).[5]

Ultimately, Plaintiff's opposition to the critical habitat designations stems from its hostility to the listings themselves. *See* Pl.'s Br. 39 ("[T]he problems with the designations here stem from NMFS's decision to list the bearded and ringed seals based on circumstances that are not projected to occur until after mid-century at the earliest."). But the Ninth Circuit has upheld these listings, finding the best available science supports

---

[5] Moreover, the *Weyerhaeuser* Court reinforced the mandatory nature of critical habitat by stating that when FWS lists a species, it "must also designate the critical habitat of that species." 139 S.Ct. at 365 (citing 16 U.S.C. § 1533(a)(3)(A)(i)).

NMFS's determination that both sea-ice dependent species are likely to become endangered in the foreseeable future. *Pritzker*, 840 F.3d at 674-75 (bearded seal); *Ross*, 722 Fed.App'x at 668 (ringed seal). Plaintiff's distaste for these holdings does not mean it can relitigate them here.

## V.  NMFS'S ECONOMIC ANALYSIS SATISFIES THE ESA'S REQUIREMENTS

Plaintiff takes issue with NMFS's analysis of economic impacts pursuant to ESA Section 4(b)(2), baselessly asserting that the critical habitat designations were "simply too enormous" such that NMFS could not have adequately considered the economic impacts. *See* Pl.'s Br. 43. But Plaintiff fails to discuss, or even cite, the lengthy Impact Analysis Reports that carefully detail the costs and benefits for each critical habitat designation and support NMFS's final determination not to exclude any areas due to economic impacts. NMFS3905-4036 (ringed seal); NMFS4057-4186 (bearded seal). While Plaintiff may disagree with NMFS's conclusions, the agency adequately considered the costs and benefits of designating critical habitat and used its discretion not to exclude areas based on economic impacts. The ESA does not require more.

Section 4(b)(2) of the ESA states:

[NMFS] shall designate critical habitat … after taking into consideration the economic impact, the impact on national security, and any other relevant impact, of specifying any particular area as critical habitat. [NMFS] may exclude any area from critical habitat if [it] determines that the benefits of such exclusion outweigh the benefits of specifying such area … unless he determines … that the failure to designate such area as critical habitat will result in the extinction of the species concerned.

16 U.S.C. § 1533(b)(2). Recently, the Supreme Court clarified that Section 4(b)(2) requires NMFS to "consider economic impact and relative benefits before deciding whether to exclude an area from critical habitat or to proceed with designation." *Weyerhauser*, 139 S.Ct. at 371.

Here, NMFS prepared exhaustive Impact Analysis Reports, pursuant to Section 4(b)(2), for each critical habitat designation to "identify and evaluate the economic, socioeconomic, and other costs and benefits associated with" the designations "and assist the [agency] in determining whether the benefits of excluding any particular area from the [critical habitat] designation outweigh the benefits of inclusion." NMFS3913; NMFS4065. These Impact Analysis Reports detail the activities that may occur in the critical habitat designations, analyze the incremental economic impacts of the designations relative to the baseline, and evaluate the benefits of critical habitat designation. NMFS3919 (ringed seal); NMFS4071 (bearded seal).

While Plaintiff claims it "defies credulity that NMFS carefully evaluated" the costs and benefits, Pl.'s Br. 43, each Impact Analysis Report is over 130 pages and carefully evaluates the costs, both direct and indirect, and benefits of critical habitat designation, NMFS3905-4036 (ringed seal); NMFS4057-4186 (bearded seal). Those economic costs are relatively low and are estimated to accrue primarily from the administrative costs of evaluating critical habitat in Section 7 consultations for oil and gas activities. NMFS4274 (ringed seal); NMFS4223 (bearded seal). NMFS does not, as

Plaintiff alleges, conclusively state that the critical habitats will not result in any project modifications beyond those required to address impacts to species under the Section 7 jeopardy standard. *Compare* Pl.'s Br. 44 *with* NMFS3931 (recognizing that NMFS did not anticipate project modifications, but "[t]his is not to say such project modifications could not occur in situations NMFS is unable to predict at this time."). Although NMFS did not assess the benefits of the designations quantitatively, its economic analyses included a qualitative assessment of the benefits, as permitted by regulation. *See* 50 C.F.R. § 424.19(b) ("Impacts may be qualitatively or quantitatively described.").

The ultimate decision as to whether to exclude areas from critical habitat is discretionary. 16 U.S.C. § 1533(b)(2) (NMFS "*may* exclude any area from critical habitat if [it] determines that the benefits of such exclusion outweigh the benefits of specifying such area." (emphasis added)). The Supreme Court in *Weyerhauser* recognized the use of the word "may" in Section 4(b)(2) confers discretion to exclude areas, and NMFS must only consider the economic impact and relative benefits before deciding how to proceed in a critical habitat designation. 139 S.Ct. at 371-72. That is just what the agency did here. NMFS's decision not to exclude the areas Plaintiff requested was made after considering the costs and benefits of designation and should be upheld by this Court.

## CONCLUSION

For the foregoing reasons, this Court should uphold NMFS's critical habitat designations for the bearded and ringed seal.

Respectfully submitted this 14th day of December, 2023,

/s/ *Kristen Monsell*
Kristen Monsell (*Pro hac vice*)
/s/ *Emily Jeffers*
Emily Jeffers (*Pro hac vice*)
Center for Biological Diversity
1212 Broadway, Ste. 800
Oakland, CA 94612
Phone: 510-844-7137
Email: kmonsell@biologicaldiversity.org
         ejeffers@biologicaldiversity.org

*Attorneys for Intervenor-Defendant
Center for Biological Diversity*

**CERTIFICATE OF COMPLIANCE WITH WORD LIMIT**

I hereby certify that this document contains 9,998 words, excluding the items exempted by Local Rule 7.4(a)(4), and complies with the word limit of Local Civil Rule 7.4(a)(1).

/s/ *Kristen Monsell*
Kristen Monsell